## MURRAY R. GOLD *v.* WARDEN, STATE PRISON
### (14296)

PETERS, C. J., SHEA, CALLAHAN, COVELLO and BERDON, Js.

Argued January 15—decision released June 9, 1992

*James A. Killen,* assistant state's attorney, with whom, on the brief, were *John Connelly,* state's attorney, and *Marcia Smith,* assistant state's attorney, for the appellant (respondent).

*Louis Nizer,* pro hac vice, with whom were *William Kunstler,* pro hac vice, *Paul Martinson,* pro hac vice, *Victor M. Ferrante* and, on the brief, *Timothy C. Moynahan,* for the appellee (petitioner).

CALLAHAN, J. This is an appeal by the respondent warden from the granting of a writ of habeas corpus and a new trial to the petitioner, Murray R. Gold.

On July 24, 1986, at the conclusion of his fourth trial, the petitioner was found guilty by a jury of two counts of the crime of murder.[1] Subsequently, on August 29, 1986, he was sentenced by the trial court to two concurrent terms of twenty-five years to life imprisonment. The petitioner refused to appeal. The charges for which the petitioner was convicted arose from the stabbing deaths of his former father-in-law, Irving Pasternak, and his former mother-in-law, Rhoda Pasternak, in their Waterbury home in 1974.[2]

On March 11, 1991, after a hearing the habeas court concluded, in a written memorandum of decision, that the petitioner had not been legally competent in 1986, when he was tried for the fourth time for the Pasternak murders.[3] The habeas court also concluded that the petitioner had not been afforded effective assistance of counsel. The court reached the latter conclusion apparently because of its finding that defense counsel had failed to take sufficient care to monitor and evaluate the petitioner's mental health during the course of the trial. Because it found that the petitioner was incompetent at the time of his 1986 trial and that he had not had effective assistance of counsel, the habeas court granted the petitioner's writ and ordered a new

---

[1] The petitioner's first trial resulted in a hung jury and a mistrial. The second culminated in a conviction that was overturned on appeal. *State* v. *Gold,* 180 Conn. 619, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980). The third trial ended in a mistrial when the petitioner discharged his attorney in open court, before the jury, midway through the proceedings.

[2] The circumstances relating to those murders are related in some detail in *State* v. *Gold,* 180 Conn. 619, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980). It is not necessary that they be repeated here.

[3] "The conviction of an accused person who is not legally competent to stand trial violates the due process of law guaranteed by the state and federal constitutions. Conn. Const., art. I, § 8; U.S. Const., amend. XIV, § 1; see *Pate* v. *Robinson,* 383 U.S. 375, 378, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966)." *State* v. *Gonzalez,* 205 Conn. 673, 686, 535 A.2d 345 (1987); see also General Statutes § 54-56d.

trial. Whether the habeas court was correct on either stated ground depends upon whether it reached a proper conclusion that the petitioner was incompetent at the time that he was tried.[4]

The respondent warden claims that the habeas court improperly: (1) concluded that the petitioner had established, under the proper standard of collateral review, that he was incompetent during his trial; (2) concluded that the petitioner had not been provided effective assistance of counsel; (3) refused to allow the judge who had presided at the petitioner's trial in 1986 to testify concerning his observations of the petitioner's demeanor; and (4) ordered a competency evaluation under General Statutes § 54-56d to determine whether the petitioner was competent to stand trial for the fifth time. We agree with the respondent's third claim and conclude that under the circumstances of this case the habeas court improperly excluded the trial judge's testimony. Because that conclusion requires that we reverse the decision of the habeas court and order a new hearing, it is not necessary that we address the respondent's other claims.[5]

The following sequence of events is relevant. After the petitioner's third trial was aborted on January 22, 1985, James R. Merikangas, a psychiatrist and neurologist, examined the petitioner and informed the court by letter dated February 4, 1985, that the petitioner

---

[4] The petitioner's claim is that he was legally incompetent throughout all the criminal proceedings in 1986. That is, he claims that he was incompetent during his trial, sentencing, conviction and subsequent refusal to appeal. Although we will refer only to the trial, our opinion encompasses the entire proceedings.

[5] We also decline to consider the petitioner's request that we review the habeas court's finding that there was sufficient evidence presented at trial to convict him. The petitioner filed neither a cross appeal under Practice Book § 4005, nor a statement of alternative grounds to affirm the habeas court's judgment under Practice Book § 4013, which would allow him to reassert on appeal his challenge to the jury's verdict.

was incompetent to stand trial at that time. Thereafter, on Merikangas' recommendation, the petitioner was sent to Whiting Forensic Institute for treatment, observation and evaluation. The petitioner remained at Whiting from February, 1985, until November 8, 1985. In February, May, August and October, 1985, he was evaluated for competency by a psychiatric team consisting of a psychiatrist, Earle L. Biassey, and a clinical psychologist, and a social worker. After the October, 1985 evaluation, the petitioner was determined by the psychiatric team to be competent to stand trial. Subsequent to being found competent, the petitioner was transferred from Whiting to the New Haven correctional center. On May 20, 1986, just prior to the commencement of jury selection for his fourth trial, at the request of Judge William J. Lavery, who was to preside at the trial, the petitioner was reevaluated by Merikangas and was found to be competent at that time.[6] Thereafter, the petitioner was tried, convicted and sentenced.

At the habeas corpus hearing the petitioner called as a witness Walter Borden, a psychiatrist, who had examined the petitioner for approximately two hours on December 21, 1990, more than four years after the petitioner was tried and sentenced in 1986. Based on that examination, his review of the petitioner's medical records, and the court records from the petitioner's third and fourth trials, Borden's opinion was that the petitioner had not been competent during his fourth trial.

Also called by the petitioner as a witness at the habeas hearing was Attorney John Williams. Williams

---

[6] Merikangas testified that on May 20, 1986, he found the petitioner to be " 'alert, oriented and cooperative' " and concluded that the petitioner's condition was " 'in remission' " at that time. The habeas court apparently agreed because it found that it was not until "some time between May 20, 1986, and July 24, 1986, [that] the petitioner became legally incompetent."

had represented the petitioner at his third trial until, midway through the trial, the petitioner had discharged him and a mistrial had been declared. Williams testified that one day, during the petitioner's fourth trial, when he had happened to be in Waterbury on other business, he had passed through the courtroom where the petitioner was being tried and had observed the petitioner and his attorney. He stated that at that time he had had an opportunity to view the petitioner for a few minutes while court was in session, the jury was present, and evidence was being taken. In its memorandum of decision the habeas court stated that Williams testified: " 'I was struck by the fact that [Gold] seemed to be in a trance. He was staring straight ahead. He wasn't reacting to anything going on in the courtroom. He did not even react to my presence in the courtroom. . . . His eyes were open but he wasn't moving. He was simply occupying a chair.' "[7]

Further, at the habeas hearing, a transcript from the petitioner's fourth trial that Borden referred to in forming his opinion was admitted. That transcript evidenced the following colloquy in the courtroom on July 8, 1986, while defense counsel was conducting a voir dire examination of an expert witness outside the presence of the jury.

"Mr. Scanlon [prosecutor]: If your Honor please, I think that the defendant's confrontation rights are being abandoned at this moment. I point that out to the court.

"The Court: Excuse me?

"Mr. Scanlon: I think his confrontation rights are being abandoned voluntarily by the defendant. I did want to point this out to Your Honor.

---

[7] The habeas court's version is not an entirely accurate quote of Williams' testimony but it conveys its import.

"The Court: Why?

"Mr. Scanlon: He seems to be sleeping.

"Mr. Serignese [assistant defense attorney]: No, he is not.

"Mr. Scanlon: He seems to be sleeping.

"Mr. Serignese: He's just resting his eyes. He is not sleeping.

"The Court: No, the record will note that he, the defendant, is awake.

"Mr. Scanlon: His eyes are closed. Excuse me.

"The Court: Proceed."[8]

The habeas court, in its memorandum of decision, appears to have placed considerable weight not only on Borden's expert testimony, but also on Williams' recitation of what he had seen during his brief observation of the petitioner, and Scanlon's viewing of the petitioner when the petitioner's eyes were closed. Lay testimony concerning the petitioner's demeanor during his trial, therefore, seems to have played an influential role in the habeas court's conclusion that the petitioner was incompetent when he was tried in 1986. That is readily understandable. Borden's examination, as previously noted, took place more than four years after the trial.[9] See *Drope* v. *Missouri,* 420 U.S. 162, 183, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975) (inherent difficulties in nunc pro tunc determination of defend-

---

[8] The habeas court quoted the entire exchange in its memorandum of decision, with slightly different wording.

[9] Earle Biassey, a psychiatrist connected with the Whiting Forensic Institute, who had examined the defendant, testified that a psychiatrist would be "standing on thin ice" if he or she tried to venture an opinion as to competency based upon an ex post facto examination of records. He also testified that he could not venture an opinion as to Gold's competency at the time of trial if he did not see him at that time.

ant's mental competency at trial that took place six years earlier); *Pate* v. *Robinson,* 383 U.S. 375, 387, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966) (difficult to determine retrospectively an accused's competence to stand trial); *State* v. *Manfredi,* 213 Conn. 500, 511, 569 A.2d 506, cert. denied, 498 U.S. 818, 111 S. Ct. 62, 112 L. Ed. 2d 37 (1990) (if state forced to wait nearly one year to conduct mental status examination, it would have little or no persuasive weight on issue of defendant's mental condition at time of trial). Something, therefore, was required to link the findings of Borden's 1990 examination with the petitioner's mental condition at the time of his trial in 1986. A significant portion of that linkage was clearly forged for the habeas court by Williams' testimony concerning his observations and Scanlon's colloquy with the trial court.

To counter Williams' testimony and Scanlon's comments, the respondent sought to call, as a witness, Judge Lavery, the presiding judge at the petitioner's fourth trial.[10] The respondent represented to the habeas court that he desired to call Judge Lavery only to testify as to his observations of the petitioner's demeanor during the course of the trial. The respondent assured the habeas court that he would confine his questions of Judge Lavery to his observations and would make no effort to elicit testimony concerning the judge's decision-making process. The petitioner filed a motion in limine, moving that Judge Lavery be precluded from testifying. The habeas court granted the petitioner's motion. In making its ruling the habeas court stated: "The court concludes that although the state may call the judge and he will testify as to what he directly observed in the courtroom, he would then become subject to cross-examination concerning his ability to observe, how he arrived at certain conclusions from his

---

[10] Judge Lavery had been subpoenaed by the respondent and was available and was present in the courtroom on February 27, 1991.

observations, and, therefore his mental process would be delved into upon cross-examination."[11]

We conclude that under the circumstances of this case the habeas court abused its discretion in excluding Judge Lavery's testimony.

A judge is not disqualified and is a competent witness to testify at a new trial or collateral proceeding to observed facts that occurred before him or her at a former trial or proceeding. *Woodward* v. *Waterbury,* 113 Conn. 457, 465, 155 A. 825 (1931); *Bishop* v. *New Haven,* 82 Conn. 51, 53, 59, 72 A. 646 (1909); *Gorham* v. *New Haven,* 79 Conn. 670, 675, 66 A. 505 (1907); *People* v. *Tippett,* 733 P.2d 1183, 1193 (Colo. 1987); *People* v. *Carpus,* 2 App. Div. 2d 653, 152 N.Y.S.2d 27 (1956); *Matter of Sheen,* 145 Misc. 2d 920, 923, 548 N.Y.S.2d 618 (1989); *People* v. *Bevilacqua,* 170 N.Y.S.2d 423, 429, rev'd on other grounds, 5 N.Y.2d 867, 155 N.E.2d 865, 182 N.Y.S.2d 18 (1958); *People* v. *McDermott,* 40 N.Y.S.2d 456, 457 (1943); *Willoughby* v. *Oklahoma City,* 706 P.2d 883, 888 (Okla. 1985); *Leighton* v. *Henderson,* 220 Tenn. 91, 99, 414 S.W.2d 419 (1967); *State* v. *Kelly,* 312 A.2d 906, 907 (Vt. 1973); C. Tait & J. LaPlante, Connecticut Evidence § 7.8; C. McCormick, Evidence (3d Ed.) § 68; 3 B. Jones, Evidence (6th

[11] It is true that an examination of the mental processes of a judge in arriving at a judicial decision should not be permitted. *United States* v. *Morgan,* 313 U.S. 409, 422, 61 S. Ct. 999, 85 L. Ed. 1429 (1941); *Washington* v. *Strickland,* 693 F.2d 1243, 1263 (5th Cir. 1982) (en banc), rev'd on other grounds, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *Henderson* v. *Department of Motor Vehicles,* 202 Conn. 453, 459, 521 A.2d 1040 (1987). The avowed purpose, however, of Judge Lavery's contemplated testimony was to elicit his observations of the petitioner's behavior during the 1986 trial, not his mental processes in arriving at judicial decisions. If the questioning on cross-examination transgressed the line between factual observations and mental processes, it was the habeas judge's obligation to disallow the questioning. As the respondent says in his brief, it would be inequitable to refuse to allow him "to call a witness for a proper purpose because [the] petitioner may attempt to question him about inadmissible matters."

Ed.) § 20.55, p. 722; 81 Am. Jur. 2d., Witnesses § 101; 97 C.J.S., Witnesses § 105; annot., 86 A.L.R.3d 633, 643.

We do not encourage the calling of a judge as a witness in subsequent proceedings in a case over which the judge presided. *Woodward* v. *Waterbury,* supra, 465. Where there is a compelling need for a judge's testimony as to observed facts in order that justice be done, however, a judge is a competent witness and should not be precluded from testifying. Id. In this case, we believe that a compelling need existed. The habeas court had in evidence lay observations of the petitioner's behavior at trial in the form of Williams' testimony and the transcript of Scanlon's remarks, and relied on that evidence in conjunction with Borden's testimony in arriving at its conclusion that the petitioner was incompetent at the time of trial. Neither Williams nor Scanlon, however, was in as advantageous a position to observe the petitioner's conduct during trial as was the judge. As the trial judge, Judge Lavery's location in the courtroom afforded him a unique opportunity to observe the petitioner's demeanor throughout the entire trial. Further, his duty to assure the petitioner a fair trial imposed upon him an obligation to scrutinize the petitioner's behavior closely. *Drope* v. *Missouri,* supra, 181; *State* v. *Watson,* 198 Conn. 598, 605, 504 A.2d 497 (1986). It stands to reason that the trial judge's prolonged observation of the petitioner's demeanor over the course of the entire trial would be highly significant in assessing the petitioner's competency.

Judge Lavery's testimony concerning his observations of the petitioner might well have undercut the probative force of Williams' testimony and Scanlon's comments. That, in turn, may have so attenuated the value of Borden's opinion as to decree a different result. See *State* v. *Zdanis,* 173 Conn. 189, 196, 377 A.2d 275

(1977); *State* v. *Martin,* 170 Conn. 161, 167, 365 A.2d 104 (1976). We conclude that the exclusion of Judge Lavery's testimony deprived the respondent of a fair opportunity to oppose the petition and, despite the latitude accorded the habeas court, was under the circumstances an abuse of discretion by the court that requires a new hearing. *Reynolds* v. *Vroom,* 132 Conn. 53, 57, 42 A.2d 336 (1945).

The judgment of the habeas court is reversed and the matter is remanded to that court for a new hearing on the habeas corpus petition.

In this opinion PETERS, C. J., SHEA and COVELLO, Js., concurred.

BERDON, J., dissenting. The majority reverses the habeas court on the *sole* ground that the court abused its discretion in not allowing the respondent, the warden of the state prison (state), to call the trial judge, Judge William J. Lavery, to testify as to his observations of the petitioner, Murray Gold. The state sought the trial judge's testimony as evidence to establish that the petitioner was competent to stand trial a fourth time for the murder of his former in-laws.

An accused is not competent to stand trial "if he is unable to understand the proceedings against him or to assist in his own defense." General Statutes § 54-56d (a). At the habeas hearing, the petitioner claimed that he was incompetent to stand trial for a fourth time because he was unable to assist in his own defense. "Of the objectives sought to be achieved by a determination of a person's sanity for purposes of standing trial, historically the foremost has been said to be the protection of the accuracy of the adjudication involved; the competency rule . . . is claimed to have been designed to ensure that the defendant is able to provide his counsel with the data necessary or relevant to the struc-

turing of a defense." *State* v. *Pastet,* 169 Conn. 13, 26, 363 A.2d 41, cert. denied, 423 U.S. 937, 96 S. Ct. 297, 46 L. Ed. 2d 270 (1975). According to the majority, the trial judge's testimony regarding his observations of the petitioner's demeanor and alertness during the course of the trial was necessary on the issue of whether the petitioner was competent to aid in his own defense.

The majority relies in part on *Woodward* v. *Waterbury,* 113 Conn. 457, 155 A. 825 (1931), for its conclusion that it was improper to exclude the trial judge's testimony. The majority, however, ignores an important rule set forth in *Woodward,* to wit: "Counsel should never summon [the trial judge to testify] if the rights of their clients can be otherwise protected." Id., 465. Since other witnesses for the state testified, and could have testified as to the petitioner's demeanor and alertness during the trial, there surely was no "compelling need" for Judge Lavery's testimony. This same evidence was or could have been obtained from other sources, for example, Walter Scanlon, the assistant state's attorney, William Collins, the petitioner's attorney at his fourth trial, Nicholas Serignese, cocounsel with Collins, any of the other attorneys present, or any of the courtroom personnel, such as the clerk, court reporter or sheriff.

Furthermore, the inclusion or exclusion of evidence by the trial court is within the court's broad discretion. Recently, in *State* v. *Steiger,* 218 Conn. 349, 373, 590 A.2d 408 (1991), with Justice Callahan writing for the unanimous court, this court held that "[b]ecause the admissibility of the [evidence] was an evidentiary question, we cannot reverse the decision of the three judge panel to admit the [evidence] unless we conclude that the panel abused its discretion or committed a clear error involving a misconception of the law." Assuming that the habeas court abused its discretion in not allowing the trial judge to testify, the majority does

not observe the established standard of review that the appellant bears the burden of establishing, not only that the trial court's ruling was erroneous, but also that the ruling was probably harmful. "Evidentiary rulings will be overturned on appeal only where there was an abuse of discretion *and* a showing by the [appellant] of substantial prejudice or injustice." (Emphasis added; internal quotation marks omitted.) *State* v. *Alvarez,* 216 Conn. 301, 306, 579 A.2d 515 (1990); see also *State* v. *Brown,* 199 Conn. 14, 25, 505 A.2d 690 (1986). Indeed, as Justice Callahan wrote for a unanimous court in *State* v. *Jackson,* 198 Conn. 314, 319, 502 A.2d 865 (1986), "[e]very reasonable presumption should be given in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. Reversal is required only when an injustice appears to have occurred." (Internal quotation marks omitted.)

Although the state established the purpose for calling the trial judge, which was to prove that the petitioner was, in fact, alert and could have been of assistance to his own defense, the state failed to prove that the exclusion of his testimony was harmful.[1] First, the state already had on the record Judge Lavery's observation that the petitioner was alert. When Scan-

---

[1] Indeed, notwithstanding the assertion of the majority that the testimony was also necessary to "undercut the probative force of . . . Scanlon's comments," in its brief the state's only claim of prejudice from the habeas court's exclusion of Judge Lavery's testimony is the following: "The court's refusal to permit [the] respondent to call Judge Lavery to testify as to his observations was particularly prejudicial, given the habeas court's undue reliance on the momentary observation by Attorney [John] Williams. Judge Lavery observed the petitioner on a daily basis for a period of months during the fourth trial and would have provided crucial evidence to undercut Attorney Williams' testimony, which the habeas court obviously considered significant.

"By refusing to allow [the] respondent a fair opportunity to rebut evidence heavily relied upon in its decision, the court committed harmful error. *State* v. *Torres,* 210 Conn. 631, 640–645 [556 A.2d 1013] (1989). Accordingly, a new habeas proceeding should be ordered."

lon told the trial judge that he thought the petitioner was sleeping, the trial judge replied: "No, the record will note that he, the defendant, is awake."[2]

Second, the habeas court had the benefit of the testimony of Collins on the demeanor and alertness of the petitioner during the trial. Collins testified that he "knew that [the petitioner] was taking a level of medication sufficient to assist . . . in his defense, and [that the petitioner] continuously knew at that time the nature of the proceedings against him." Collins also testified that he had "a good professional, close relationship" with the petitioner throughout the trial. He stated that there was never a time when he believed that the petitioner was unaware of the court proceedings. Collins asserted that the petitioner actively participated in the jury selection process and that prior to trial, the petitioner discussed defense strategy with Collins.

Therefore, the trial judge's testimony would only have been repetitive and cumulative of the testimony that the petitioner had been alert during the trial. In sustaining convictions, we have long held that the erroneous exclusion of testimony that is merely repetitious or cumulative is not harmful error. See *State* v. *Person,* 215 Conn. 653, 664–65, 577 A.2d 1036 (1990), cert. denied, 498 U.S. 1048, 111 S. Ct. 756, 112 L. Ed. 2d 776 (1991) (erroneous exclusion of cumulative evidence did not have a prejudicial impact on the outcome of the trial); *State* v. *Robinson,* 213 Conn. 243, 260, 567 A.2d 1173 (1989) (erroneous inclusion of cumulative evidence was not harmful); *State* v. *Jones,* 132 Conn. 682, 683, 47 A.2d 185 (1946) (it was within the trial court's discretion to refuse to permit questioning that had been "asked and ruled upon on several occasions").

[2] See the majority opinion for the complete colloquy between the trial court and assistant state's attorney Walter Scanlon.

Third, Scanlon was called by the petitioner to testify at the habeas hearing. Scanlon testified that, in his opinion, no "gross injustice" had been done to the petitioner. Because of Scanlon's continuing presence throughout the trial and his close proximity to the petitioner, the state could have taken the opportunity during its cross-examination to question Scanlon further on his observations as to the petitioner's alertness.

Finally, it is clear to me that the habeas court did not rely upon Attorney John Williams' momentary observation of the petitioner, but rather upon the substantial professional testimony of Dr. Walter Borden, a prominent psychiatrist, who, during his years of practice, has been involved in at least fifteen cases before this court. Dr. Borden's testimony must be reviewed within the context of the facts of this case, which are not contested. He testified that the petitioner had a history of treatment for mental illness that dates back to 1974; that between January 22, 1985, and May 20, 1986, the petitioner had been found incompetent to stand trial by state doctors at three competency hearings ordered by the court; and that the petitioner was discharged from the state's Whiting Forensic Institute (Whiting) in late 1985 with the warning that, although he was then competent, his mental condition had not been "completely ameliorated."[3]

---

[3] The report of the diagnostic team at Whiting stated, in part, the following: "We wish to emphasize that this should not be interpreted to mean that [the petitioner's] mental condition has been completely ameliorated. He suffers from a mental condition, in our opinion, that will require some form of continued treatment in order to maintain his competency over the course of the extended future. . . . Progress in actually obtaining counsel is uncertain due to practical inerts connected with his confinement here and his own financial circumstances. Initiative has been taken in the direction of obtaining counsel, according to our understanding, and a continued program of psychiatric treatment is now advised as a necessary adjunct to the maintenance of his competency."

Dr. Borden concluded that at the time of the fourth trial, the petitioner was not competent to assist in his defense. There were two principal bases for his conclusion. The first basis was that the petitioner's psychosis rendered him unable to work with counsel. He determined that the petitioner suffered from schizophrenia with depression and paranoia. He testified that as "[p]art of his paranoia, [the petitioner] had paranoid delusions of persecution. Hallucinations in that regard [have] involved the legal system, judges, lawyers [and] his lawyers."

The petitioner's background is important to a full understanding of his paranoia and how it affected his competency to assist in his own defense. The petitioner is a survivor of the German holocaust and underlying his paranoia was his confinement in several concentration camps as a child together with his father, mother and sister. When the petitioner was eleven years old, his family escaped from the concentration camp at Auschwitz with the assistance of English rescuers. The petitioner was responsible for his sister, who was eight years old, but during the confusion, she was left behind. The rescuers forbade the petitioner's family from searching for the girl for fear that they would be discovered by the German guards and executed. As a result of his time in the camps and this traumatic experience, the petitioner developed a syndrome known as survivors guilt, which is particular to concentration camp survivors, hostages or persons who have survived natural disasters. This syndrome manifests itself as massive grief. Dr. Borden pointed out that the petitioner's "condition was compounded by the fact that his sister [had] perished and . . . in his growing up, [he] was feeling responsible for his mother's sadness." He testified that "[m]uch of his distrust, which is clearly paranoid, in a way makes sense, if you look at the concentration camp and what the adults — and especially

[what] the children experienced there. [The petitioner] would not trust a lawyer, certainly, and he was incompetent; and on a long-term basis, he wouldn't trust anybody, nor would he trust doctors."

Dr. Borden testified that the petitioner has denied certain aspects of his life as a result of his psychotic condition. He relayed that the petitioner denied his concentration camp experience, denied that he is Jewish, denied that his parents were Jewish, and denied that he had a sister who died. He stated that this kind of denial is called "psychotic denial." He testified that this is "denial of very basic issues of reality and reality about himself. [The petitioner] had to keep that [reality] entirely out of his awareness." According to Dr. Borden, these paranoid delusions came out in bizarre ways and extended to his attorneys. He testified that the petitioner considered all his lawyers to be crazy. He reported that the petitioner said that "he didn't understand [the lawyers]; they didn't understand him." Dr. Borden concluded that the petitioner was not able to work effectively with his lawyers in his own defense.

The second principal basis for Dr. Borden's conclusion was the high dose of medication that the state had prescribed for the petitioner. Although the Whiting diagnostic team cautioned that the petitioner's mental condition required "some form of continued treatment in order to maintain his competency,"[4] the only treatment for his psychosis was an increased daily dose of Navane from the fifteen milligrams prescribed for him while at Whiting, to twenty milligrams given to him at the correctional facility at New Haven. Navane is a major tranquilizer and it is used in schizophrenia treatment to quiet patients and help make them manageable. Dr. Borden testified that the dosage was

---

[4] See footnote 3, supra.

increased without authorization from Whiting or from the court. This higher dosage made the petitioner more apathetic, somnolent and unresponsive. He further testified that the "twenty milligrams for a maintenance dosage of Navane is high. It would tranquilize him no doubt. It would control his behavior. It reflected in the records and my examination, [that it] would interfere with his comprehension, with his awareness, with his ability to respond. It certainly would help him behave in the courtroom if sitting and not creating a disturbance is what is desired and that's all." Dr. Borden concluded that as a result of this over medication, the petitioner's ability to participate in his own defense was impaired.[5]

Our law is clear that "[t]he conviction of an accused person who is not legally competent to stand trial violates the due process of law guaranteed by the state

---

[5] Dr. Borden testified that as a result of the high dose of Navane administered by the state, the petitioner "had no idea of what was going on. In my examination of him, what he told me was he doesn't understand why they didn't bring in the testimony having to do with his shoes, and it was at that point that he was pointed out to be unresponsive, that the testimony had to do with that.

"He told me, in my examination of him, that he was kind of unclear about the trial. He thought it was going to go on, and all of a sudden, it was over. And he said he never got a chance to explain, or to question, or to say--he thought that would come up later about the evidence which he was convinced would exonerate him, and he said all of a sudden, it was over.

"That has to do with the medication, and it does really appear that he was over medicated. I have really more than doubts about that. Why was [it] increased? Why was it increased from fifteen milligrams to twenty milligrams? I mean, I know you don't increase medication like that in that amount unless there's a deteriorated mental condition; unless there's something going on. The timing is such, that it would [be] apt to cause over-sedation. These medications, a medication like Navane, when the dosage is increased, it's apt to cause sedation for a period of time until there's—well, at some level, it can just cause over-sedation and apathy, but that's most apt to occur with a recent change. If you're upping the dosage, you're more apt to get sedation in the immediate period after the change--and I'm not talking about hours; I'm talking about days, weeks."

and federal constitutions. Conn. Const., art. I, § 8; U.S. Const., amend. XIV, § 1; see *Pate* v. *Robinson,* 383 U.S. 375, 378, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966). This rule 'imposes a constitutional obligation, [on the trial court], to undertake an independent judicial inquiry, in appropriate circumstances, into a defendant's competency to stand trial . . . .' *State* v. *Watson,* [198 Conn. 598, 605, 504 A.2d 497 (1986)]; see *Drope* v. *Missouri,* 420 U.S. 162, 180, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975); *State* v. *DeAngelis,* 200 Conn. 224, 242, 511 A.2d 310 (1986). 'Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial.' *Drope* v. *Missouri,* supra, 181. This constitutional mandate is codified in General Statutes § 54-56d (a), which provides that '[a] defendant shall not be tried, convicted or sentenced while he is not competent.' " *State* v. *Gonzalez,* 205 Conn. 673, 686–87, 535 A.2d 345 (1987).

We have made it clear, when upholding a conviction, that we will "not presume error; the trial court's ruling is entitled to the reasonable presumption that it is correct unless the party challenging the ruling has satisfied its burden demonstrating the contrary." *State* v. *Crumpton,* 202 Conn. 224, 231, 520 A.2d 226 (1987). That presumption, however, is not present in this case. Indeed, we have continuously ruled that if the trier of fact has other evidence on the issue, then that weighs heavily against the error being harmful. In *State* v. *Silveira,* 198 Conn. 454, 503 A.2d 599 (1986), we held that the exclusion of relevant testimony about the defendant's state of mind was not harmful. "In light of the additional evidence pertaining to the defendant's state of mind that was placed before the jury, we do not believe that the erroneous exclusions of evidence deprived the defendant of either his state constitutional

right to testify or his federal constitutional right to present an effective defense. Because the erroneous exclusions of evidence do not amount to a constitutional violation, it is the defendant's burden to show that the errors were harmful. *State* v. *Brown,* 187 Conn. 602, 611, 447 A.2d 734 (1982); *State* v. *Gordon,* 185 Conn. 402, 419, 441 A.2d 119 (1981) [cert. denied, 455 U.S. 989, 102 S. Ct. 1612, 71 L. Ed. 2d 848 (1982)]; *State* v. *Ruth,* [181 Conn. 187, 196–97, 435 A.2d 3 (1980)]. In this case we find that this burden has not been met." Id., 479.

It is particularly troubling that I cannot find anywhere in the majority's analysis what it uses as the standard of review. From what I can detect from the majority opinion, there is a double standard of review, one for claims of error raised by a defendant and one for reviewing the same claims raised by the state. Furthermore, the majority greatly diminishes the factfinding jurisdiction of the habeas court. The majority concludes that the habeas court's ruling was pivoted on Williams' testimony, which was supplied by his "brief observation" of the petitioner during a trial that began on June 24, 1986, and concluded one month later on July 24, 1986. To assume that the mere mention of Williams' observation in the habeas court's memorandum of decision must be pivotal is contrary to our law.[6]

---

[6] Indeed, it appears contrary to the state's position. The state asserted in its brief: "Most of Williams' testimony involved his relationship with [the] petitioner during the third trial. [The subject matter of the present case is the petitioner's fourth trial.] . . . Williams also testified that, one day during [the] petitioner's fourth trial, he 'passed through the courtroom briefly and . . . observed Mr. Gold and his counsel.' . . . As he passed through the courtroom, Williams tried not to be 'disruptive.' . . . He testified that [the] petitioner did not appear to be 'reacting' to anything going on in the courtroom, including Williams' presence. . . . He stated that [the] petitioner appeared 'very different from the way he had been during the third trial . . . ' and that he observed [the] petitioner 'staring straight ahead.' . . . Williams testified that he spent 'probably less than five minutes' passing through the courtroom and that he did not sit down in the courtroom at any point. . . .'"

It cannot be said that the habeas court's conclusion "was clearly erroneous." *Myers* v. *Manson,* 192 Conn. 383, 391, 472 A.2d 759 (1984).

I agree with the habeas court's well reasoned decision that during the fourth trial the petitioner was legally incompetent because he could not assist in his own defense. Accordingly, the petitioner's conviction violated federal and state constitutional law and the statutory law of this state. The petitioner is entitled to a new trial. I dissent.