**McKinley BATTLE & Battle's Transportation, Inc., Appellants,**

v.

**William M. THORNTON and Vernon Williams, Appellees.**

**No. 92–CV–752.**

District of Columbia Court of Appeals.

Argued Feb. 2, 1994.
Decided Aug. 11, 1994.

---

Jeff Evan Lowinger, with whom Steven Lewicky, Chevy Chase, MD, was on the brief, for appellants.

R. Kenneth Mundy, Washington, DC, for appellees.

Before FERREN, STEADMAN and FARRELL, Associate Judges.

FERREN, Associate Judge:

McKinley Battle and his non-emergency ambulance company, Battle's Transportation, Inc. (plaintiff-appellants), sued, respectively, their former attorneys, William Thornton and Vernon Williams, (defendant-appellees), alleging malpractice in defending appellants against criminal charges of Medicaid fraud. A jury returned a verdict in favor of Thornton and Williams. Battle and his company filed a timely appeal, advancing two principal contentions: (1) the trial court erred in ruling that the relevant standard of care for representing a criminal defendant charged with Medicaid fraud is the standard attributable to a general practitioner in civil and criminal practice, not to a Medicaid fraud specialist; (2) the court also erred in allowing the defendant lawyer-appellees to present evidence at trial showing the strength of the government's Medicaid fraud case against Battle. We affirm.

## I.

In early 1987, as part of a Medicaid fraud investigation, the District of Columbia government served a subpoena on Battle's Transportation, Inc., requiring the company to surrender its records for inspection. Without consulting an attorney, McKinley Battle, the company's president, turned over the requested records. Approximately six months later, the government informed Battle that he was going to be arrested for Medicaid fraud. On the day of his arrest, Battle contacted attorney William Thornton, who told Battle to "turn himself in." Battle spoke with Thornton again the day after Battle's arraignment and, on November 9, 1987, returned to court with Thornton to plead not guilty.

Upon Thornton's recommendation, Battle retained attorney Vernon Williams to provide separate representation for Battle's Transportation, Inc. Battle then paid $1,250 to each attorney for the respective representations. During one of Battle's several meetings with Thornton and Williams, Thornton presented Battle with a list of the government's charges against him. Battle testified at trial that Thornton had explained that the government was charging Battle with seventy-three counts of Medicaid fraud. According to Battle, however, Thornton never explained what Medicaid fraud was, what the government was required to prove against him, or who the government's witnesses might be.

Approximately one week after the meeting when Battle learned of the charges, Thornton informed Battle that the government had offered a plea bargain in which it would agree, in exchange for Battle's guilty plea, to reduce the number of counts from seventy-three to twenty, to recommend no incarceration, and to recommend a modest fine against Battle's Transportation, Inc. plus repayment of $1,885 to the Medicaid program. Battle testified that Thornton explained to him that accepting the government's plea bargain would also result in a six-month suspension from the District's Medicaid program. Battle further testified that he had told Thornton repeatedly that he was not guilty of fraud, but that Thornton nevertheless had

encouraged him to accept the government's plea offer to avoid opening up "a keg of nails." Battle added that Thornton had told him he could be sentenced to one year in jail for each of the seventy-three counts against him if he elected to go to trial and lost.

Battle then testified that he had argued with Thornton and Williams for a couple of weeks about the desirability of accepting the plea offer, but that finally he had agreed to do so a few days before his scheduled status conference. On January 14, 1988, Battle appeared before Judge Nunzio, pled guilty to Medicaid fraud, and subsequently paid a $1,000 fine and $1,885 in restitution.

A month after pleading guilty, Battle received a letter from the District government suspending him for six months from the District's Medicaid program. The suspension did not come as a surprise because Thornton and Williams had informed Battle of this expected consequence of the plea. Battle then testified that approximately one year later, he received a letter from the United States Department of Health and Human Services (HHS) requesting the reasons for his guilty plea. Battle prepared a response to the letter and showed it to Williams before mailing it. Six months later, after Battle's period of suspension from the District's Medicaid program had ended, Battle received a response from the HHS Inspector General's office, dated August 2, 1989, suspending Battle's Transportation, Inc. from the federal Medicaid program for five years. Battle then testified that, upon receiving the letter, he contacted Thornton "[t]o see what [he] could do about it." Thornton read the letter from the Inspector General and told Battle that he would do some research. Battle testified that when he received no response from Thornton, he contacted Williams, who told Battle that Thornton "was washing his hands of it and that he could do what he wanted to do." Battle then went to the District's Medicaid office, which advised him to seek new counsel. As a result, Battle retained attorney Michael Flanagan.

Flanagan testified that after analyzing the company's records, he became convinced that Battle had not intended to submit false claims but instead "may have made mistakes in his billing" or "might have been somewhat negligent [in his billing]." Flanagan then testified that he had moved the court to withdraw Battle's guilty plea on the ground that the Judge who had accepted the plea had failed sufficiently to explore whether Battle had formed the requisite intent for Medicaid fraud. The court granted the motion to withdraw Battle's plea on the condition that Battle turn over all the company's files to the Medicaid fraud control unit so that the government, in its discretion, could reinstate the charges against him.

Flanagan also testified that soon after Battle had withdrawn his guilty plea, the government had reinstated the charges against Battle and his company, charging sixty counts of Medicaid fraud, including some Medicaid claims that had not been mentioned in the original indictment. Flanagan filed a motion to dismiss on the grounds of vindictive prosecution and of expiration of the statute of limitations. The trial court did not decide the motion because, upon the recommendation of Judge McIntyre, the parties reached an administrative settlement allowing Battle to resume his business as Medicaid transportation provider in the District of Columbia after paying the District $4,000. In addition, HHS had dismissed its charges against Battle and permitted him to resume his federal Medicaid business. Flanagan's law firm billed Battle and his company a total of $89,000 for services rendered.

Battle then filed the present malpractice action against Thornton and Williams, claiming negligent failure to advise him that a guilty plea would result in a five-year suspension from the federal Medicaid program. A six-member jury returned a verdict for the attorney-defendants.

## II.

Appellants contend the trial court erred in concluding that the relevant standard of care for judging the attorneys' representation was the standard required of "general practitioners in civil and criminal practice," not a higher standard applicable to Medicaid fraud specialists. Appellants accordingly contend that the trial court erred in permitting appel-

lees' expert witness, Peter Meyers, Esq., to testify as to the general practitioner's standard of care, and in refusing to allow appellants to present expert testimony consistent with their own proposed (higher) standard of care.[1]

### A.

▮ In a lawyer malpractice case we have said:

The elements of an action for professional negligence are the same as those of an ordinary negligence action. "The plaintiff bears the burden of presenting evidence 'which establishes the applicable standard of care, demonstrates that this standard has been violated, and develops a causal relationship between the violation and the harm complained of.'" *Morrison v. Mac-Namara*, D.C.App., 407 A.2d 555, 560 (1979) (citations omitted). A uniform standard of care applies in actions for negligence: reasonable care under the circumstances. *Morgan v. District of Columbia*, D.C.App., 449 A.2d 1102, 1108–09 (1982). Inherent in such reasonable care, however, is the requirement "that those with special training and experience adhere to a standard of conduct commensurate with such attributes." *Morrison, supra* at 560. Thus, "a lawyer must exercise that degree of reasonable care and skill expected of lawyers acting under similar circumstances." *Id.* at 561.[2]

*O'Neil v. Bergan*, 452 A.2d 337, 341 (D.C. 1982). Under *O'Neil*, therefore, a lawyer must exercise that degree of reasonable care and skill expected of someone who has "special training" (*i.e.*, training as a lawyer), coupled with enough "experience," to handle the case under the circumstances.

The question, however, remains: how "specialized" must an attorney's training and experience be to satisfy the duty of care required for legal representation in a particular case? The trial court ruled on the pretrial motion *in limine* that "unless there is proof, *prima facie* proof that these attorneys, the Defendants, held themselves out as specialists, the standard is not going to be the standard for specialists. It's going to be a standard of general practice." That is to say, only if the lawyers had held themselves out to appellants as Medicaid fraud specialists would the court have based the applicable standard of care on the standard governing such specialists.[3]

Appellants argue in their brief that in a specialized practice such as Medicaid fraud, which allegedly requires specialization and expertise beyond that of a general criminal law practitioner, an attorney who is not an expert but accepts such representation "has an affirmative duty to tell the client that he [or she] is not competent, by knowledge and experience, to mount an effective defense to charges of Medicaid fraud." Otherwise, the attorney must be held to the specialist standard of care. As we understand this argument, appellants essentially are contending that, as a matter of fact, every Medicaid fraud case inevitably requires a specialist, and thus that, as a matter of law, the stan-

---

1. Appellants did present expert testimony, but we do not know what it was because appellants have not provided a transcript of that testimony.

2. *See Morrison v. MacNamara*, 407 A.2d 555, 561 (D.C.1979) (physician must exercise that degree of reasonable care and skill expected of physicians acting under similar circumstances); *Bell v. Jones*, 523 A.2d 982, 987 (D.C.1986) (surveyor must exercise that degree of care and skill which a surveyor of ordinary skill and prudence would exercise under the same or similar circumstances); *Sinai v. Polinger Co.*, 498 A.2d 520, 531 (D.C.1985) (assess landlord's duty of care to tenant by reference to care normally required of other property managers).

3. In *Wright v. Williams*, 47 Cal.App.3d 802, 807, 121 Cal.Rptr. 194, 199 (Cal.Ct.App.1975), the court said that a "lawyer holding himself [or

herself] out to the public and the profession as specializing in an area of the law must exercise the skill, prudence, and diligence exercised by other specialists of ordinary skill and capacity specializing in the same field." *See generally* DISTRICT OF COLUMBIA RULES OF PROFESSIONAL CONDUCT Rule 1.1 (Competence), Comment [1] (Legal Knowledge and Skill):

... In many instances the required proficiency is that of a general practitioner. Expertise in a particular field of law may be required in some circumstances. *One such circumstance would be where the lawyer, by representations made to the client, has led the client reasonably to expect a special level of expertise in the matter undertaken by the lawyer.*

(Emphasis added.)

dard of care for measuring ordinary negligence in every such case will be the standard of care required of a specialist—unless the lawyer affirmatively disclaims having the required expertise and the client, adequately informed of the risk, retains that attorney's services nonetheless.

Inherent in this argument is a premise that Medicaid fraud is a generally recognized criminal law subspecialty requiring expert qualifications, and thus that anyone taking such a case without affirmatively disclaiming such specialized competence implicitly warrants that he or she has such expert qualifications. If this were not the premise, an attorney's failure to disclaim expertise would simply mean, in a Medicaid fraud case, what any criminal attorney implies in accepting a retainer: that taking the case implies competence to handle criminal cases generally; that Medicaid fraud does not present the kind of challenge that inevitably (*i.e.*, in every such case) requires a higher, more specialized, level of expertise than other kinds of criminal cases require; and that, in the Medicaid fraud case at hand, the lawyer's acceptance of the representation implies the legal knowledge, skill, and experience—indeed, the competence—necessary to handle that particular matter.

The foregoing analysis suggests three questions: (1) Does the legal profession have a recognized Medicaid fraud specialty which a lawyer practices at his or her peril without

having the expert qualifications required—or at least without affirmatively disclaiming such expertise to the prospective client? (2) If a Medicaid fraud specialty is not recognized as such, under what circumstances will a general criminal law practitioner be held liable for malpractice for defending a Medicaid fraud prosecution? (3) What qualifications shall a trial judge require before permitting a general criminal law practitioner to offer expert testimony in a malpractice case concerning a lawyer's handling of a Medicaid fraud prosecution? We turn to the first inquiry.

### B.

The legal profession, in contrast with the medical profession, usually has not divided its practitioners into certified specialists. The American Bar Association has approved state certification of legal "specialists." *Compare* MODEL RULES OF . PROFESSIONAL CONDUCT Rule 7.4 (1994) ( [in jurisdictions "where there is a regulatory authority granting certification or approving organizations that grant certification] a lawyer may communicate the fact that the lawyer has been certified as a specialist in a field of law by a named organization or authority but only if. . . .") *with* MODEL CODE OF PROFESSIONAL RESPONSIBILITY DR 2–105(A) (Final Draft 1969) ("A lawyer shall not hold himself [or herself] out publicly as a specialist," with certain exceptions).[4] But as of October 1992,

---

**4.** The American Bar Association adopted Canon 27 in 1908 to regulate attorney advertising. In 1951, the ABA amended Canon 27 to add what has become a traditional recognition of attorney specialists in the areas of admiralty, patent, and trademark law. The amendment to Canon 27 allowed attorneys in those three fields of law to designate themselves as such on their letterheads and shingles. *See* AMERICAN BAR ASSOCIATION, OPINIONS ON PROFESSIONAL ETHICS 77 (1967).

In 1969, the ABA adopted DR 2–105 of the MODEL CODE OF PROFESSIONAL RESPONSIBILITY, which included the traditional recognition of admiralty, patent, and trademark specialists in DR 2–105(A)(1), as well as the following provision for jurisdictions that decided to recognize and certify additional types of specialists:

DR 2–105 Limitation of Practice
(A)(4) A lawyer who is certified as a specialist in a particular field of law or law practice by the authority having jurisdiction under state law over the subject of specialization by lawyers may hold himself out as such specialist

but only in accordance with the rules prescribed by that authority.
MODEL CODE OF PROFESSIONAL RESPONSIBILITY DR 2–105.

Until this court's creation of the District of Columbia Bar (unified) and the court's adoption of Rule XI establishing the Disciplinary Board (now Board on Professional Responsibility), no disciplinary rules had ever been formally adopted to govern attorney conduct in the local court system. On April 1, 1972, this court adopted the American Bar Association's MODEL CODE OF PROFESSIONAL RESPONSIBILITY, with certain amendments (including minor rewording of DR 2–105(A)(1)). DR 2–105(A)(4) was adopted as is, but without any practical effect since the District did not certify specialists.

Finally, in 1983, the ABA adopted Rule 7.4 of the MODEL RULES OF PROFESSIONAL CONDUCT, which included the traditional recognition of admiralty, patent, and trademark attorneys, in addition to an optional provision for jurisdictions that wish to certify other legal specialists:

only fifteen jurisdictions had implemented specialization programs, and the District of Columbia was not among them (and is not now). *See Qualifications, Specialization,* Laws.Man. on Prof.Conduct (ABA/BNA) 21:4001 (1992) (hereafter *Specialization*). Indeed, in considering the ABA MODEL RULES OF PROFESSIONAL CONDUCT, this court, on the D.C. Bar's recommendation, declined to adopt Model Rule 7.4 altogether. See *supra* note 4; Proposed Rules of Professional Conduct and Related Comments, Showing the Language Proposed by the American Bar Association, Changes Recommended by the District of Columbia Bar Model Rules of Professional Conduct Committee, and Changes Recommended by the Board of Governors of the District of Columbia Bar, at 229 (Nov. 19, 1986) (hereafter Legislative History).[5] Moreover, states that have programs

to certify attorneys as specialists have adopted rather general areas of specialty.[6] Louisiana, for example, recognizes specialists in tax law but does not divide its tax specialists further into subspecialties such as international tax or corporate tax. *See Specialization,* at 21:4011. Many states, in fact, have adopted only two legal specialties: civil trial practice and criminal trial practice. *See Specialization,* at 21:4008–13. We have found no state, however, that recognizes Medicaid fraud as a subspecialty of criminal law.

Because the District of Columbia does not certify lawyer specialists, it would be altogether unreasonable—indeed, impossible—to require lawyers called as expert witnesses in a malpractice trial to be formally recognized in some way as specialists.[7] Fur-

Rule 7.4 Communication of Fields of Practice (c) [for jurisdictions where there is a regulatory authority granting certification or approving organizations that grant certification] a lawyer may communicate the fact that the lawyer has been certified as a specialist in a field of law by a named organization or authority but only if:
. . .
MODEL RULES OF PROFESSIONAL CONDUCT Rule 7.4. As elaborated later in the text and below in note 5, this court, on recommendation of the D.C. Bar Board of Governors, chose to omit Model Rule 7.4 when adopting the Rules of Professional Conduct effective January 1, 1991. *See* D.C.App.R. X, app. A (1993).

5. The District of Columbia Bar Model Rules of Professional Conduct Committee stated as its reason for recommending omission of Model Rule 7.4:

In light of the general prohibition of false or misleading communications stated in paragraph (a) [of Rule 7.1], the Committee saw no need to retain proposed Rule 7.4, which deals specifically with statements concerning fields of practice. A lawyer is under the same obligation to be accurate and to avoid misrepresentation in describing personal expertise or experience in particular fields as in making any other representations or communications which are subject to the requirements of paragraph (a) [of Rule 7.1].
Legislative History at 229.

6. Various jurisdictions collectively have adopted the following areas of specialty: criminal law (including criminal trial practice), civil trial practice, bankruptcy (commercial and consumer), domestic relations (including family law), injury and wrongful death litigation, real estate, tax, workers' compensation, labor relations,

wills, estates, probate, immigration and nationality, and natural resources. *See Specialization,* at 21:4008–13. Florida has adopted the following additional practice areas: administrative and governmental, admiralty, antitrust, appellate practice, aviation, civil rights, collections, corporation and business, environmental, international, juvenile, securities, trial practice—general, trial practice—commercial, and trial practice—personal injury and wrongful death. *See Specialization,* at 21:4010.

7. We note that although this court does not certify or otherwise recognize attorney specialists, the court has approved legal advertising that permits attorneys to describe the particular fields of law in which they practice. EC 2–14, an Ethical Consideration under former Canon 2 of the (now superseded) Code on Professional Responsibility, stated:

In some instances a lawyer confines his or her practice to a particular field of law. In the absence of local controls to insure the existence of special competence, a lawyer should not be permitted to hold himself or herself out as a specialist or as having official recognition as a specialist, other than in the fields of admiralty, trademark, and patent law where a holding out as a specialist historically has been permitted. *A lawyer may, however, indicate if it is factual, a limitation of his or her practice or that the lawyer practices in one or more particular areas or fields of law in public announcements which will assist laypersons in selecting counsel and accurately describe the limited area in which the lawyer practices.*
DISTRICT OF COLUMBIA CODE OF PROFESSIONAL RESPONSIBILITY EC 2–14 (1989) (emphasis added) (footnote omitted). The implications of DR 2–105 and EC 2–14 were discussed in D.C.Bar Legal Ethics

thermore, the clincher here is that, even in states where specialties are recognized, they are no more specialized than, for example, practitioners of "criminal law" or "criminal trial practice." See *supra* note 4.[8]

## C.

■ Because, in the District of Columbia (and elsewhere), a Medicaid fraud specialty is not recognized, the remaining questions are easily answered. As we made clear in *O'Neil*, an attorney in any case is responsible for having not only the formal legal training reflected by membership in the bar but also enough additional knowledge, as well as experience, to permit the "exercise [of] that degree of reasonable care and skill expected of lawyers acting under similar circum-

stances." *O'Neil*, 452 A.2d at 341 (quoting *Morrison v. MacNamara*, 407 A.2d 555, 561 (D.C.1979)). The required experience presumably could, in certain instances, include continuing legal education necessary to become informed about, and keep abreast of, new legal areas and developments. *See* DISTRICT OF COLUMBIA RULES OF PROFESSIONAL CONDUCT Rule 1.1 Comment [6] (Maintaining Competence) (1993). The required experience also could, on some occasions, include previous involvement with the same or similar kinds of cases. Thus, it is entirely possible that, based on ad hoc evaluation of individual qualifications, a particular general criminal law practitioner may not be qualified to handle a particular—or even any—Medic-

---

Comm.Op. 69 (1979), in which the Legal Ethics Committee stated that a law school may publish a directory of its graduates with each graduate stating

the areas of law in which he or she practices or the particular area or field of law to which his or her practice is limited, but he or she may not hold himself or herself out in the District of Columbia to be a recognized or certified specialist in any area of law other than patents, trademarks, or admiralty.

D.C.Bar Legal Ethics Comm.Op. 69 (1979). Similarly, the Committee stated in D.C.Bar Legal Ethics Comm.Op. 70 (1979), that

the participation by lawyers in an approved referral service that advertises "specialty" panels is not prohibited by the Code so long as there is no implication in the advertisements that the lawyers have been officially recognized or certified in their specialty.

Thus, according to the D.C. Bar Legal Ethics Committee, the Code of Professional Responsibility permitted attorneys in the District to hold themselves out to the public as specialists if the attorneys "in fact devote[d] a substantial portion of their practice" to that specialty. D.C.Bar Legal Ethics Comm.Op. 95 (1981). Attorneys could not, however, represent that they were "certified" or "recognized" specialists in any area of law other than the traditionally recognized specialties of admiralty, trademarks and patents.

According to the District of Columbia Bar Model Rules of Professional Conduct Committee, which recommended that this court omit Rule 7.4, see *supra* note 4, from its Rules, District of Columbia attorneys would be obligated under the Rule 7.1(a) to "avoid misrepresentation in describing [their] personal expertise or experience in particular fields." Legislative History, at 229; see *supra* note 5. Accordingly, the Committee "saw no need to retain proposed Rule 7.4, which deals specifically with statements concerning fields of practice."

8. Even in medical malpractice actions we have held that "a physician need not be a specialist in the field of which he [or she] speaks in order to testify as an expert." *Ornoff v. Kuhn and Kogan Chartered*, 549 A.2d 728, 732 (D.C.1988) (quoting *Baerman v. Reisinger*, 363 F.2d 309, 310 (1966)); *District of Columbia v. Anderson*, 597 A.2d 1295, 1299 (D.C.1991) ("medical expert need not be a specialist in order to be qualified to offer an opinion"); *see Sher v. De Haven*, 199 F.2d 777, 782 (1952) (same) *cert. denied*, 345 U.S. 936, 73 S.Ct. 797, 97 L.Ed. 1363 (1953). "[I]t is the actual qualifications of the witness that count, rather than his [or her] title," *Anderson*, 597 A.2d at 1299, and thus the "training and specialization of the witness go[ ] to the weight rather than the admissibility of the evidence, generally speaking." *Baerman*, 363 F.2d at 310. For example, an ophthalmologist has been found qualified to render expert opinion on the causes of retinal damage, notwithstanding the fact that he or she is not a retinology specialist. *See Kling v. Peters*, 564 A.2d 708, 716 (D.C.1989). A hematologist, while not knowledgeable about general gynecology standards, has been held competent to testify as an expert in a malpractice action alleging a gynecologist's failure to determine that the patient suffered from a blood clotting deficiency before surgery. *See Ornoff*, 549 A.2d at 731–32. An internist, although not a specialist in psychiatry or neurology, may be competent to testify about the physical effects of electroshock therapy. *See Kosberg v. Washington Hosp. Ctr., Inc.*, 394 F.2d 947, 949 (1968). And, a general practitioner with "experience in treating patients suffering from hypothyroidism" has been held competent to testify as to the accepted treatment practices among cardiologists in the locality. *See Baerman*, 363 F.2d at 310. In sum, a physician-witness can qualify as an expert in a medical malpractice case if the witness is familiar with the medical procedure at issue, irrespective of the witness's own area of specialization.

aid fraud case and should decline the representation.[9]

But that possibility is quite different from what we understand appellant's only contention to be on appeal, which we have rejected: that no practitioner can properly undertake a Medicaid fraud case unless he or she qualifies as a Medicaid fraud specialist in some formally discernible or recognized sense, or else expressly disclaims that qualification before accepting the representation. The differences at issue here are subtle but real. Appellant in effect claims, incorrectly, that for any criminal attorney responsibly to handle any Medicaid fraud case, that attorney must be held to, or affirmatively disclaim, credentials evidencing Medicaid fraud specialization and related expertise. To the contrary, we say, with the trial court, that the correct standard of care, unless affirmatively represented otherwise, see *supra* note 3, is definable, not by reference to a recognized specialty, but by reference to the general practice of criminal law *coupled with* the requirement that the particular attorney have the necessary training and experience to handle the particular case. The more complex and complicated the case, the more training and experience presumably will be required to assure the lawyer "exercise[s] that degree of reasonable care and skill expected of lawyers acting under similar circumstances." *O'Neil*, 452 A.2d at 341 (quoting *Morrison*, 407 A.2d at 561). It is important, however, to indicate, in the extreme, where we differ from appellant's position: a general criminal practitioner will not necessarily be unqualified to handle a Medicaid fraud case, or any other kind of criminal case, simply because that attorney has never handled such a case before.[10] For many reasons, some attorneys without such experience will be competent, nonetheless, to do so; others, quite obviously, will not.

It follows that an attorney called to testify as an expert witness in a Medicaid fraud case need not—indeed, cannot—be a formally designated specialist; rather, any general criminal law practitioner will be eligible to provide such testimony, provided that the attorney can convince the court on voir dire that he or she possesses the legal knowledge, skill, and experience reasonably necessary to undertake the expert's role. More specifically, an attorney will be qualified to testify as an expert in a legal malpractice action if the witness is a general legal practitioner who by training and experience is familiar with the degree of care and skill reasonably to be expected of lawyers acting under the circumstances of the case in which the expert is testifying. *See O'Neil*, 452 A.2d at 341.

In this case, therefore, the appellees-lawyers' expert, Peter Meyers, Esq., a general practitioner with substantial experience in criminal law, was not necessarily unqualified to testify as an expert merely because he was not a Medicaid fraud specialist or because he had never handled a Medicaid fraud case. The issue, rather, is attorney Meyers' training and experience: were they sufficient to qualify him to testify as an expert about the proper handling of a Medicaid fraud case?

### D.

The trial court qualified attorney Meyers to testify because of his legal training and his intensive experience as a criminal lawyer. During voir dire, Meyers testified

---

9. *See* District of Columbia Rules of Professional Conduct Rule 1.1 (Competence):

   (a) A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.

   (b) A lawyer shall serve a client with skill and care commensurate with that generally afforded to clients by other lawyers *in similar matters.*

   (Emphasis added.) *See also O'Neil*, 452 A.2d at 341; District of Columbia Code of Professional Responsibility DR 6–101(A)(1): "A lawyer shall not ... [h]andle a legal matter which he [or she] knows or should know that he [or she] is not competent to handle, without associating with him [or her] a lawyer who is competent to handle it."

10. *See* District of Columbia Rules of Professional Conduct Rule 1.1 (Competence), Comment [2] (Legal Knowledge and Skill):

   A lawyer need not *necessarily* have special training or prior experience to handle legal problems of a type with which the lawyer is unfamiliar.

   (Emphasis added.)

that he was a visiting professor of clinical law at George Washington University National Law Center. He further testified that he had represented, at both the trial and appellate levels, approximately sixty criminal defendants in the past ten years, including five or six cases that challenged criminal convictions on the ground of ineffective assistance of counsel. Meyers also testified that, although he had never been involved in a Medicaid fraud case, he had participated in other types of criminal fraud cases, including one in which he represented a doctor who was charged with writing false prescriptions. Finally, Meyers testified that he had studied and was familiar with the standard of care required of an attorney performing services for a client charged with criminal fraud, and that he also was knowledgeable about an attorney's obligation to inform his or her client about the consequences of a conviction.

The "qualification of a particular witness to testify as an expert is largely within the domain of the trial judge." *Ornoff,* 549 A.2d at 731 (quoting *Jenkins v. United States,* 307 F.2d 637, 645 n. 19 (1962)). Appellants contend that attorney Meyers was not competent to testify because he had no experience in the field of Medicaid fraud. Because the trial court has broad discretion to qualify experts, because Medicaid fraud is not a recognized specialty as such, and because attorney Meyers had extensive experience in the practice of criminal law, including criminal fraud (which as a category includes Medicaid fraud), we conclude that the trial court did not abuse its discretion in qualifying Meyers to testify as an expert. Any weakness attributable to Meyers' lack of experience with Medicaid fraud was a matter for cross-examination at trial, affecting the weight to be accorded his testimony.[11]

## III.

Appellants next contend the trial court erred in admitting testimony and argument from the lawyer-appellees showing the strength of the government's Medicaid fraud case. Appellants argue, more specifically, that the trial court erred in allowing the prosecutors who brought the original criminal case to testify at trial. Under the circumstances, we disagree.

■ The trial court ruled at the pretrial hearing that if appellants opened the door with evidence tending to show that the government's Medicaid fraud case had been weak, then appellees would not be "barred from presenting evidence to the contrary to show that it's not so." The trial court's pretrial ruling was not improper. *See Lampkins v. United States,* 515 A.2d 428, 430 (D.C.1986) (introduction of incompetent or irrelevant evidence by a party opens door to admission of otherwise inadmissible evidence).[12]

Appellants proceeded to introduce evidence at trial that clearly suggested the government's Medicaid fraud case had been weak. For example,. appellants' principal

---

11. Appellants contend in their brief that they "should have been permitted to put on expert testimony regarding whether Thornton and Williams represented [appellants] in a manner consistent with what a knowledgeable Medicaid fraud practitioner would have done in the same circumstances." If by this they mean that the trial court should have defined the standard of care by reference to a Medicaid fraud specialty, rather than by reference to the general practice of criminal law, we have already explained why we disagree. If, however, they merely mean what they literally say—that they should have been permitted to put on expert testimony about "what a knowledgeable Medicaid fraud practitioner would have done in the same circumstances"—we are inclined to agree, for this *sentence* seems to say only that appellants should have been allowed to put on expert testimony to inform the jury about how a competent lawyer should have conducted a Medicaid fraud defense.

In any event, we are not aware that the trial court forbade such testimony. As indicated earlier, see *supra* note 1, appellants have not provided a transcript of their expert's trial testimony.

12. Appellants argue that "the effect of the trial judge's permitting testimony regarding the prior criminal action against [appellants] was to introduce inadmissible testimony of Battle's character." This argument has no merit. As discussed above, appellants opened the door to testimony about the strength of the government's underlying Medicaid fraud case, and appellants cannot now complain that such evidence was inadmissible. *See Hockman v. United States,* 517 A.2d 44, 52 (D.C.1986) ("government is not permitted to introduce evidence of a defendant's bad character until the defendant expressly 'opens the door' to his character").

witness, Michael Flanagan—the attorney who helped Battle withdraw his guilty plea—testified that when he had looked at Battle's company records, he had "found as a matter of fact[, with respect to] most of the charges that were alleged[, that] services had been provided." Flanagan added that there were only "73 counts alleged out of 21,000 in the universe of potential claims," which is a "relatively small number," and that of the seventy-three counts, thirty were related to one individual for whom services actually had been performed. Finally, Flanagan testified he was "comfortable that there was certainly no intent that ... could be inferred from the mere number of counts [alleged]." It is therefore clear from this evidence tending to show the weakness of the government's fraud case that appellants opened the door to rebuttal testimony from the government regarding strength of the government's case.

### IV.

Appellants also argue that the trial court erred in preventing them from calling Judge McIntyre as a witness to rebut appellees' evidence showing the strength of the government's fraud case against them. Appellants allege that Judge McIntyre would have testified that he "believed that [the government's] case against Battle had very little chance of success," and that the judge had expressed this opinion to the prosecutors when the government reinstated Medicaid fraud charges against Battle after he had withdrawn the guilty plea. There was no error.

Because of the position and authority of judges, there is considerable risk that a jury will accord a judge's testimony substantially greater weight than it deserves. *See People v. Drake,* 841 P.2d 364, 368 (Colo. Ct.App.1992) ("given the weight to which a jury might accord such evidence and given the judge's other duties, we view the practice of [calling a judge as a witness] as one which should be sparingly used and only when the proponent of the evidence shows that the judge's testimony is not only relevant but also *necessary* to prove a material element of the case"); *Cornett v. Johnson,* 571 N.E.2d 572, 575 (Ind.Ct.App.1992) ("the judge [when testifying] appears to be throwing the weight

of his position and authority behind one of two opposing litigants"). Such testimony is likely to be particularly prejudicial in malpractice actions. Furthermore, in this case, Judge McIntyre was not familiar with all the evidence since the case did not go to trial. The trial court, therefore, did not err in declining to permit Judge McIntyre to testify. *See Cornett,* 571 N.E.2d at 575 ("The risk of prejudice to the other party would be great if the presiding judge were allowed to testify in a subsequent malpractice action."); *Hirschberger v. Silverman,* 80 Ohio App.3d 532, 609 N.E.2d 1301, 1306 (1992) ("We agree with those courts which have held that a judge cannot testify in a malpractice case that the court's decision in the underlying case would have been different absent the alleged act of malpractice."). *But cf. Gold v. Warden, State Prison,* 222 Conn. 312, 610 A.2d 1153, 1157 (1992) ("Where there is a compelling need for a judge's testimony as to observed facts in order that justice be done ... a judge is a competent witness and should not be precluded from testifying.")

*Affirmed.*