**Dwight W. CRAWFORD, Appellant,**

v.

**Debra KATZ, et al., Appellees.**

**No. 09–CV–301.**

District of Columbia Court of Appeals.

Argued Jan. 11, 2011.

Decided Dec. 8, 2011.

---

420

Booth M. Ripke, with whom Larry A. Nathans, Baltimore, MD, was on the brief, for appellant.

Justin M. Flint, with whom Aaron L. Handleman, Hanover, MD, was on the brief, for appellee Alan Balaran.

D. Stephenson Schwinn, Washington, DC, with whom Reid M. Weinsten was on the brief, for appellees Debra Katz, David Marshall and Bernabei & Katz, PLLC.

Elizabeth Treubert Simon, with whom Pamela A. Bresnahan, Washington, DC,

was on the brief, for appellee Lynne Bernabei.

Before REID, Associate Judge, Retired,* RUIZ, Associate Judge, Retired,** and FERREN, Senior Judge.

REID, Associate Judge, Retired:

This case involves professional negligence claims arising out of legal representation provided by appellees Alan Balaran, and Debra Katz, David Marshall, Bernabei & Katz, PLLC ("B & K"), and Lynne Bernabei to appellant, Dwight W. Crawford, in connection with his employment as Executive Vice President and Chief Financial Officer ("CFO") of BET Services, Inc., and BET Holdings II, Inc. ("BET").[1] The representation included efforts to negotiate a severance package, and the prosecution and settlement of his wrongful termination lawsuit.[2] In three different orders, the trial court granted the respective motions for summary judgment and reconsideration filed by defendants/appellees. Mr. Crawford essentially contends that the trial court erred by granting summary judg-

ment to all defendants/appellees and dismissing all of his claims.

For the reasons stated in this opinion, we affirm the trial court's grant of summary judgment to Ms. Bernabei as to the period after November 3, 2000,[3] but we are constrained to reverse the judgment of the trial court as to Mr. Balaran, Ms. Katz, B & K, and Mr. Marshall. We therefore remand this case for further proceedings.

Before proceeding to the factual summary of the case, we summarize the trial court's dispositive orders. In the first trial court order, signed on November 26, 2008, the Honorable Judith Bartnoff determined that except for 1.25 billable hours relating to a "meet and confer" discovery conference, Ms. Bernabei's only involvement in Mr. Crawford's case was her assignment as supervisor of Mr. Marshall prior to his admission to the District of Columbia Bar. Since Mr. Marshall was admitted to the D.C. Bar on November 3, 2000, the trial court granted Ms. Bernabei's motion for summary judgment "for the period after November 3, 2000, but ... denied [the motion] to the extent that there are claims

---

* Judge Reid was an Associate Judge of the court at the time of argument. Her status changed to Associate Judge, Retired, on April 7, 2011.

** Judge Ruiz was an Associate Judge of the court at the time of argument. Her status changed to Associate Judge, Retired, on September 1, 2011.

1. BET Services, a District of Columbia corporation and wholly owned subsidiary of BET Holdings II, is the management entity for BET. BET Holdings II, a Delaware corporation, operates several cable television stations, publishing companies, movie production entities, and restaurants.

2. At the time Mr. Crawford filed his lawsuit against BET, B & K was named Bernabei, Katz & Balaran, PLLC. The firm changed its name to Bernabei & Katz PLLC following Mr. Balaran's departure from the partnership. Mr. Balaran initially remained with the firm as Of Counsel. Our reference to "appellees"

does not include Mr. Balaran during the time he was no longer with the firm.

3. Ms. Bernabei's sole individual responsibility in this case was the supervision of Mr. Marshall before he was admitted to the District of Columbia bar. We reverse the trial court's November 26, 2008, order as to Ms. Bernabei individually for the period before November 3, 2000, during which she supervised Mr. Marshall, because Professor Hazard rendered no opinions in this case regarding the standard of care and her individual liability as Mr. Marshall's supervisor. In fact, he specifically stated that "any liability [Ms. Bernabei] would have would follow from" her role as a partner of the law firm. Moreover, during his October 3, 2006, deposition, Mr. Marshall was unable to say whether Ms. Bernabei had supervised him in the drafting and filing of Mr. Crawford's complaint.

... regarding actions of Mr. Marshall prior to November 3, 2000." The court also granted Mr. Balaran's second motion for summary judgment on the ground that Mr. Crawford was required to "produce expert testimony to establish the standard of care owed to him by the defendants," but that the testimony of his expert, Professor Geoffrey C. Hazard, Jr., "cannot serve to establish the standard of care, when he states that his opinion is based on the opinion of an employment law expert and [Mr. Crawford] has not offered that underlying opinion." The trial court not only dismissed Mr. Crawford's claims against Mr. Balaran, but because the other defendants had incorporated Mr. Balaran's motion by reference, the trial court dismissed "any claims against the other defendants premised on the alleged negligence of defendant Balaran."

Judge Bartnoff's second order, signed on January 5, 2009, granted in part the summary judgment motion lodged by Ms. Katz, B & K, and Mr. Marshall. The trial court concluded that BET's Super. Ct. Civ. R. 11 sanctions motion, which was pending against the attorneys when they gave Mr. Crawford settlement advice about his lawsuit against BET, did not "create[ ] a conflict that tainted the defendants' settlement advice or preclude them from providing such advice in the underlying case." There was no conflict, the court reasoned, because the wrongful termination lawsuit was based on information that Mr. Crawford had provided to Ms. Katz, B & K and Mr. Marshall. Because Judge Bartnoff was uncertain whether her ruling "cover[ed] all of [Mr. Crawford's] claims of professional negligence against

the defendants," she granted the summary judgment motion "in part."

In her third order, signed on February 12, 2009, Judge Bartnoff granted the motion for reconsideration filed by B & K. The court indicated that in their motion, these defendants had "carefully review[ed] all the allegations in [Mr. Crawford's] First Amended Complaint and [had] demonstrate[d] that there are no issues remaining to be resolved by the [c]ourt, in light of the [c]ourt's prior rulings. In addition, the trial court "treat[ed] the motion for reconsideration as conceded" under Super. Ct. Civ. R. 12–I(e)[4] because Mr. Crawford did not respond to the motion; nor did he ask for an extension of time in which to respond. Consequently, the court granted summary judgment to these defendants on all claims and dismissed Mr. Crawford's complaint.

## FACTUAL SUMMARY

The record reveals the pertinent interactions between Mr. Crawford and BET prior to his termination, as well as the circumstances surrounding his wrongful termination lawsuit against BET, the settlement of that lawsuit, and his subsequent professional negligence complaint against his former attorneys. Mr. Crawford's tenure with BET was relatively short. He began his duties as BET's Executive Vice President and CFO on January 4, 1999, and BET fired him on January 31, 2000. His basic task was to manage BET's corporate finance department. Early in his year with BET, Mr. Crawford became concerned about aspects of BET's financial affairs and he began to share some of his concerns with BET's top officials.

---

4. Super. Ct. Civ. R. 12–I(e) provides in relevant part:

Points and authorities; failure to file opposing points and authorities. . . . A statement of opposing points and authorities shall be filed and served within 10 days or such further time as the Court may grant. If a statement of opposing points and authorities is not filed within the prescribed time, the Court may treat the motion as conceded.

Although Mr. Crawford received a favorable performance evaluation (an overall rating of 88%) in October 1999, from the President of BET (Debra Lee), the relationship between Mr. Crawford and the President deteriorated substantially in late November 1999, during audit work conducted by BET's external auditors. On December 8, 1999, Mr. Crawford and Mr. Balaran (on behalf of Bernabei, Katz & Balaran) executed a retainer agreement which stated, in part, that Mr. Balaran's firm would "represent [Mr. Crawford] with respect to severance negotiations with BET Holdings, Inc.," and that "[t]he [f]irm's representation ... [would be] limited at this juncture to counseling [Mr. Crawford] and attempting to negotiate a severance agreement with BET Holdings, Inc."

Subsequently, Mr. Crawford transmitted two communications to Ms. Lee, which became the subject of controversy in his underlying litigation with BET, as well as his professional negligence action against his lawyers. Mr. Crawford's complaint in this case identifies statements from both communications which he claims harmed his litigation against BET and forced him into an unfavorable settlement. Although Mr. Balaran drafted both communications for Mr. Crawford's signature, defendants/appellees emphasize that Mr. Crawford is the source of the information in both communications.

The first communication, a memorandum dated December 20, 1999, concerned Mr. Crawford's "Phantom Stock Option Plan." [5] The memorandum began with the following sentence: "Recently, we discussed my voluntary departure from BET." [6] The second communication was Mr. Crawford's January 21, 2000, letter to Ms. Lee. The letter referenced a "recent conversation" between Ms. Lee and Mr. Crawford, and it sought to "make clear" that Mr. Crawford had not resigned. After the sentence referencing the conversation, the first two paragraphs of the letter stated:

At the outset, I wish to make clear that I never resigned from my position at BET. As you are well aware, my memorandum of December 20, 1999 was drafted for the sole purpose of exploring negotiations following the discussion of my possible voluntary departure. In that regard, you submitted to me a proposed separation agreement which purported to incorporate several of the topics we had discussed.

It is against this backdrop that I find your statement suggesting that I have resigned to be without foundation. What I find even more disturbing is the timing of your suggestion. I felt that negotiations toward a mutually satisfactory departure were proceeding at an acceptable pace. Then, once I brought to your attention on January 14, 2000 what I suspected to be fraudulent conduct on the part of several highly placed BET employees, you have now threatened me with removal from my position. I find these threats unacceptable from a professional perspective and curious giv-

---

**5.** Mr. Crawford's memorandum concerned the vesting period for 20,000 Phantom Stock Options apparently granted to him by a July 29, 1999, letter agreement.

**6.** The memorandum mentioned Mr. Crawford's efforts pertaining to certain BET radio transactions and indicated that he "would agree to forego investigating other employ-

ment opportunities and remain with BET until June 2000 (or earlier, in the event the radio transactions are closed ahead of schedule or abandoned)." In exchange, Mr. Crawford asked BET to "accelerate the vesting period" for the stock to June 30, 2000, and to "allow [him] "to cash out the maximum amount permitted" under the stock option plan.

en its proximity to my revealing to you the internal misconduct I referenced above.

A third document, this one drafted by Mr. Crawford (but never transmitted to anyone), also sparked controversy—a January 31, 2000 memorandum regarding "[t]ermination."[7] The memorandum indicated that Ms. Lee had informed him on January 21st that his last day of BET employment would be January 31st, and that on January 24th, Ms. Lee "had announced to Senior Staff members and to [his] staff that [he] had resigned [his] position as of January 31st." After detailing some of his personal concerns about BET's financial operations and the lack of support that he had received from Ms. Lee, Mr. Crawford concluded his memorandum with the following paragraph:

Shortly after this Senior Staff meeting and after the conclusion of a very difficult financial statement audit (an audit made more difficult by the reluctance of the advertising sales department to supply critical information), I met with [Ms. Lee] to discuss my future with BET. I again expressed my disappointment in the support of me and her lack of recognition of the improvement in the Finance department. We discussed my year at BET and the ongoing battles with fellow members [of] BET's Senior Staff. We specifically discussed the audit, the lack of cooperation during the FY 2000 budget and the ongoing abuse of BET corporate card priv[i]leges and the fact that these abuses [are] hurting

BET's reputation and cost us money. After more discussion I suggested that due to the lack of support from her and [Mr. Johnson] and strained relationship with several members of Senior Staff, it may be best for me and for BET that I leave the company. [Ms. Lee] responded by saying that she could sense I was feeling this way and seemed to concur that it would be best that I leave. We then talked about timing and the fact [that] we were in the middle of the radio bidding and financing process. [Ms. Lee] stated there is never a good time for this [and] said take as much time as you like.

BET's Vice President for Human Resources hand-delivered a termination letter to Mr. Crawford on January 31, 2000, effective as of that date. On August 16, 2000, Mr. Crawford filed a complaint in Superior Court for the District of Columbia against BET, BET Chairman & CEO Robert L. Johnson, and Ms. Lee. By that time, Mr. Balaran had left his law firm. Consequently, Mr. Crawford and Ms. Katz (on behalf of B & K) signed an amended retainer agreement in mid-August 2000, authorizing B & K's representation with respect to Mr. Crawford's wrongful discharge lawsuit against BET. Mr. Crawford's complaint contained two counts, wrongful discharge and civil conspiracy. The Honorable James E. Boasberg presided over the case. As one of its defensive actions in response to Mr. Crawford's complaint, BET filed a Super. Ct. Civ. R. 11[8]

---

7. BET discovered the draft memorandum in Mr. Crawford's computer after his employment ended.

8. Under Super. Ct. Civ. R. 11(c), the trial court "may ... impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation." Subdivision (b)

provides that in presenting filings to the trial court:

[A]n attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—
(1) it is not being presented for any improper purpose, such as to harass or to

sanctions motion against Mr. Crawford's lawyers. Judge Boasberg ordered the Rule 11 motion to be held in abeyance pending discovery, which was to proceed in two stages.

Near the end of the first stage of discovery, Ms. Katz sent Mr. Crawford a letter, dated January 28, 2003, encouraging him to settle his case with BET. The letter stated, in part:

> Unfortunately, the first stage of discovery has shown that your case is much weaker than we believed it to be at the time we filed the lawsuit. This is due not only to the relatively consistent version of events that BET and its auditors have presented, but also to the fact that your own writings and testimony have undermined the version of the events that forms the basis for your claim for wrongful termination in violation of public policy....
>
> Prior to your showing us a copy of your January 31, 2000, memorandum to the audit committee, which you provided to us only several weeks ago, ... we were confident in our ability to prove, as we had alleged in the Complaint, that when you met with Debra Lee in late November and insisted on her support in correcting BET's [alleged] unlawful financial practices, "Ms. Lee replied that BET did not provide the right employment environment for Mr. Crawford. She made it clear that BET no longer wished to continue his employment. At no time, however, did Mr. Crawford,

either directly or indirectly, resign his employment with BET."

> Unfortunately, your draft memorandum of January 31, 2000, to the audit committee directly contradicts this version of events. You write that you, and not [Ms.] Lee, "suggested" that you should leave BET; that [Ms.] Lee "concurred"; and that you and [Ms.] Lee put off until later a discussion about the "timing" of your departure. The memorandum not only undercuts a key allegation in the Complaint, but it is also fully consistent with the testimony that [Ms.] Lee gave at her deposition.

The letter also discussed what the attorneys would need to prove to prevail on the complaint, broached settlement possibilities, and detailed anticipated legal costs if mediation efforts were not successful.

On February 6, 2003, the parties agreed to a settlement; BET would pay Mr. Crawford $750,000 in exchange for his dismissal of all claims against BET, including any claim for attorneys' fees and costs. In connection with the settlement, Mr. Crawford sent a letter to BET, dated February 20, 2003, stating, in part, that he "did not have evidence to assert that BET, Mr. Johnson or Ms. Lee engaged in any unlawful conduct or directed others to do so."

Mr. Crawford filed his professional negligence lawsuit against defendants/appellees in December 2004, and he lodged his first amended complaint in March 2005. The amended complaint alleged several negligent actions by defendants/appellees, as well as conflicted representation. For

---

cause unnecessary delay or needless increase in the cost of litigation;
(2) the claims, defenses and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and
(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

example, Mr. Crawford claimed that Mr. Balaran prepared the text of his December 20, 1999, memorandum and his January 21, 2000, letter to Ms. Lee "which became [ ] damaging piece[s] of evidence used by BET's counsel in defending the underlying lawsuit." He maintained that Ms. Katz "erroneously advised [him] that he would 'likely' lose on summary judgment" because of the December 20 and January 21 communications; he further averred that defendants/appellees failed to "advise him of the legal significance of 'voluntarily resigning' as opposed to 'being involuntarily terminated'"; and declared that Ms. Katz "negligently erred with regard to the analysis of the strength of [his] claims." In addition, Mr. Crawford asserted that: "The very existence of the Rule 11 [sanctions motion] created a conflict between Defendants['] personal, financial interests and their duty to zealously represent [him] through the exercise of independent professional judgment." Mr. Crawford sought damages "believed to be not less than [t]wenty [m]illion [d]ollars ($20,000,-000), plus interest and costs." In response to Mr. Crawford's complaint, defensive motions were filed; the parties also conducted discovery.

During discovery, Mr. Crawford learned of a January 12, 2003, email from Ms. Katz to Mr. Marshall commenting on the advice given to Mr. Crawford by Mr. Balaran. The email stated:

> Thanks for putting in all this time on [Mr.] Crawford['s case]. It feels like it's going to be very hard to overcome the bad advice [Mr.] Balaran gave him and [Mr. Crawford's] failure to tell a clear and credible story about what happened. But given that I have to go against these

pigs with a weak case, I'm glad to be doing it with you.

Several depositions were taken, including those of Ms. Katz, Mr. Crawford, and Professor Hazard. Ms. Katz stated in her deposition that "[f]or a very short period of time [she] thought Alan Balaran had a responsibility for the January 31 [draft] memorandum to the audit committee" but she later acknowledged that Mr. Balaran "had nothing to do with that memorandum and [Mr. Crawford] wrote [it] on his own and didn't tell anybody he had done it." In Mr. Crawford's declaration filed in opposition to defendants' motion for summary judgment, he asserts that he was never informed by B & K that Mr. Balaran had given him "bad advice."

Mr. Crawford's expert, Professor Geoffrey C. Hazard, Jr., opined in a letter dated January 18, 2007, that B & K "adversely affected Mr. Crawford's wrongful discharge claim against BET . . ., with the foreseeable consequence of diminishing [Mr. Crawford's] settlement (or eventual judgment) value." Professor Hazard opined that B & K's follow-up letter "could not have been fully effective to overcome its adverse effect." In addition, he stated that BET's Super. Ct. Civ. R. 11 "motions for sanctions against the lawyers[ ] . . . created a conflict between the lawyers and Mr. Crawford," and that "the letter of January 28, 2003 [from the lawyers] to Mr. Crawford was designed to shift to him the responsibility for the weakened position as against BET." [9]

As we indicated at the outset, Judge Bartnoff granted summary judgment in favor of all defendants/appellees in three orders, dated November 26, 2008, January 5, 2009, and February 12, 2009. Mr. Crawford filed a timely appeal.

---

9. We discuss Professor Hazard's letter and his related deposition in greater detail later in this opinion.

## ANALYSIS

We first set forth legal principles and standards which will guide our *de novo* review of this summary judgment case. The standards of review for a summary judgment motion and for a motion to reconsider are familiar. " 'Summary judgment is appropriate only when the record, viewed in the light most favorable to the non-moving party, establishes that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.' " *Television Capital Corp. of Mobile v. Paxson Comm. Corp.*, 894 A.2d 461, 466 (D.C.2006) (quoting *Taylor v. Akin, Gump, Strauss, Hauer & Feld*, 859 A.2d 142, 146 (D.C.2004)). "Issues of negligence frequently 'are not susceptible of summary adjudication, but should be resolved by trial in the ordinary manner.' " *Parker v. Martin*, 905 A.2d 756, 759 (D.C. 2006) (quoting *Croce v. Hall*, 657 A.2d 307, 310 (D.C.1995)). In reviewing the trial court's grant of a motion for summary judgment, we resolve all inferences in favor of the non-moving party. *Television Capital Corp. of Mobile*, 894 A.2d at 466 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). We apply "the same substantive standard as the trial court" and "conduct[ ] an independent review of the record." *Id.* (quoting *Taylor*, 859 A.2d at 146). We review a motion to reconsider for abuse of discretion. *Hefazi v. Stiglitz*, 862 A.2d 901, 907 (D.C.2004) (citing *Lynch v. Meridian Hill Studio Apts., Inc.*, 491 A.2d 515, 517 (D.C.1985)). If we determine that the trial court erred in granting a motion for reconsideration simply because no opposition was filed, "[t]he question then becomes whether [the trial court] should have granted summary judgment had [it] examined the record." *Kurth v. Dobricky*, 487 A.2d 220, 224 (D.C.1985).

To prevail on a claim of legal malpractice under District of Columbia law, "a plaintiff must establish [1] the applicable standard of care, [2] a breach of the standard of care, and [3] a causal relationship between the violation and the harm complained of." *Biomet Inc. v. Finnegan Henderson LLP*, 967 A.2d 662, 664–65 (D.C.2009) (citing *O'Neil v. Bergan*, 452 A.2d 337, 341 (D.C.1982)). Generally, "a lawyer must exercise that degree of reasonable care and skill expected of lawyers acting under similar circumstances." *Battle v. Thornton*, 646 A.2d 315, 319 (D.C. 1994) (citing *O'Neil*, 452 A.2d at 341).

Expert testimony is required to establish the standard of care "unless the attorney's lack of care and skill is so obvious that the trier of fact can find negligence as a matter of common knowledge." *Flax v. Schertler*, 935 A.2d 1091, 1106 (D.C.2007) (citing *O'Neil, supra*, 452 A.2d at 341) (internal quotation marks omitted). "[A]n attorney will be qualified to testify as an expert in a legal malpractice action if [he or she] is a general legal practitioner who by training and experience is familiar with the degree of care and skill reasonably to be expected of lawyers acting under the circumstances of the case in which the expert is testifying." *Battle, supra*, 646 A.2d at 323 (citing *O'Neil*, 452 A.2d at 341). Furthermore, since "the admission or exclusion of expert testimony is committed to the informed discretion of the trial judge, ... [we will] sustain[ ] [the judge's ruling] unless it is manifestly erroneous." *Steele v. Tiger Market*, 854 A.2d 175, 181 (D.C.2004) (citations and internal quotation marks omitted).

### The Standard of Care

Mr. Crawford raises several challenges to the trial court's grant of summary judgment to defendants/appellees. We address first his contention that the trial court

improperly concluded that his professional negligence case failed because his expert, Professor Hazard, did not establish the applicable standard of care. Our review of Professor Hazard's opinion letter, his deposition, and the trial court's order of November 26, 2008, constrains us to conclude that the trial court inadvertently overlooked, did not address, or misinterpreted key aspects of this case discussed in Professor Hazard's opinion letter and his explanatory deposition.

First, the trial court placed some emphasis on the fact that "[t]he December 20, 1999, memorandum did not use the term 'resign'..." but stated, " 'Recently, we discussed my voluntary departure from BET.' " Contrasting "resign" or "resignation" with "voluntary departure" is hardly a meaningful distinction and obscures Professor Hazard's main emphasis with respect to what he considered the pertinent terminology, terminology that fit with the basic theory of Mr. Crawford's wrongful termination claim. Professor Hazard stated in the second paragraph of his opinion letter that in arriving at his opinions in this case, he assumed facts provided by legal counsel for Mr. Crawford in a communication entitled "Statement of Facts that Legal Expert May Assume." One of the critical facts assumed by Professor Hazard is that Mr. Crawford was fired, that he did not resign. Thus, during his deposition, Professor Hazard contrasted "resignation" or "resigned" with "discharge" or "fired." In addition, he distinguished between "voluntary" and "involuntary" ('voluntarily resigned' and 'fired'). Furthermore, he used these distinctions in his response to questions about the standard of care in this case, as revealed by the following exchange between counsel for Mr. Balaran and Professor Hazard:

Q. Did you make any determination as to ... the standard of care that would apply in this case ... ?

A. [M]y opinion expresses certain opinions concerning aspects of the conduct of the lawyers. For example, whether they embarrassed Mr. Crawford's claim by the December 20, 1999, letter. I think given the sensitivity of the subject of whether there is a resignation or a discharge, that that letter is embarrassing to the claim. And ... that fact goes to the standard of conduct.

Q. Do you believe that the standard of conduct, using your terms, is a national standard or is a local standard?

A. Well, I think on the question of the significance of this letter, I think it would be embarrassing to—at least to some extent, in an employment case anywhere in the country, because, by definition, an employment case importantly involves whether the person quit or was fired.... [W]rongful discharge, by definition, depends on it being a discharge and not a voluntary resignation.

Q. All right. And I take it that in rendering your opinion, you made the assumption that Mr. Crawford was fired as opposed to resigned, correct?

A. That's what it says in the Statement of Facts, yes.

Q. Right. And in fact, in your opinion, you said ...: It is clear that there is serious contradiction in the accounts of the relationship, but you are assuming and this is the second paragraph, that the facts set forth in the statement are found by the trier of fact?

A. Yes.

Q. So, your determination was that those facts as set forth by [counsel for Mr. Crawford] would be the

facts that the jury would find, correct?

A. That's my assumption, yes.

Q. All right. And if, in fact—I take it that if you were told or if you understood—assuming, you know, this assumption that Mr. Crawford is the one that told BET that he was going to leave, he was going to voluntarily leave the position, your opinion would be different, wouldn't it?

A. Sure.

These excerpts show Professor Hazard's main point was that the letter of December 20, 1999, "embarrassed Mr. Crawford's claim," regardless of whether the letter used "resignation" or "voluntary departure," since Mr. Crawford maintained that he was wrongfully discharged or fired. Moreover, they reveal the existence of a material fact in dispute between the parties, whether Mr. Crawford resigned or was fired. Significantly, in another exchange between counsel for Mr. Balaran and Professor Hazard, it becomes clear that the emphasis in this case is not on the use of the word "resignation" as opposed to "voluntary departure":

Q. Does the fact ... that this letter in no place says "resignation," but uses the term "voluntary departure," ..., does that affect your analysis of the standard of care in this case as it relates to Mr. Balaran? ....

A. I don't think so. I mean, let's wheel it back. The question is whether that kind of statement compromises, embarrasses, weakens, detracts from, those are all different ways of describing it, a claim framed in terms of a wrongful discharge. And I think the answer is sure it does, because ... it is circumstantial evidence that the departure,

which ensued thereafter, was voluntary on the part of Mr. Crawford as distinct from involuntary on his part.

Professor Hazard opined that the memorandum of December 20, 1999 (from Mr. Crawford to Ms. Lee which was drafted by Mr. Balaran), "embarrassed [Mr. Crawford's] claim and thereby contributed to the diminution of its value." Not only do these excerpts from Professor Hazard's deposition make clear the critical terminology in this case and the existence of a material factual dispute, but they also reveal that Professor Hazard stated a national standard of care applicable to Mr. Balaran, Ms. Katz, B & K, and Mr. Marshall.

The second reason the trial court stressed in granting summary judgment in favor of defendants/appellees is that Mr. Crawford needed an employment law expert and Professor Hazard based his opinion on the assumption that testimony would be presented by "an expert in employment litigation to the effect that the [December 20, 1999] memorandum's characterization of Mr. Crawford's separation from BET as a resignation 'is seriously compromising of a [wrongful termination] claim.'" However, Mr. Crawford did not designate an expert in employment law.

Our review of Professor Hazard's deposition leads us to conclude that the professor's standard of care opinion, regarding the lawyers' alleged legal malpractice, did not hinge on anticipated testimony from an employment law expert. We first set forth excerpts from Professor Hazard's opinion letter and related deposition, as context for our discussion. Professor Hazard stated, in part:

The December 20, 1999 letter drafted by Mr. Balaran, signed by Mr. Crawford, referred to the basis of Mr. Crawford's proposed separation from BET as

a resignation. This was an inaccurate characterization, because Mr. Crawford was not resigning but had expected to continue in his employment. Under any circumstances such an inaccuracy would be embarrassing in the ensuing negotiations predicated on Mr. Crawford's expectations. I understand there will be testimony by an expert in employment litigation that such a characterization by the claimant is very seriously compromising of a discrimination [sic] claim.[10] On that basis, the mischaracterization was a substantial departure from recognized standards of professional conduct, because a lawyer in negotiation should present the client's claims and contentions in as reasonably positive terms as are consistent with provable facts.

During his deposition, Mr. Balaran's lawyer posed questions to Professor Hazard about an employment law expert:

Q. [I] take it you would agree that you are not being offered as an expert witness with regard to employment cases, correct?

A. Yes, except, of course, this is an employment case and does involve professional conduct, but I am not an expert in employment law.

Q. And do you have a recollection of indicating in your report that ... you're relying upon there being an expert on employment law in offering your opinion, correct?

A. Yes.

Q. Do you know ... who is the employment lawyer expert that you are relying upon to offer your opinion?

A. No.

Q. Did you ask [counsel for Mr. Crawford] whether or not he had an employment lawyer expert that was going to offer an opinion that you could rely upon?

A. I don't think I asked it that way, but I said: I am not an expert in that field; you are making certain contentions about the consequences so far as the employment law claim is concerned, *in particular that it apparently is very serious, and in the maintaining of such claim that there be any doubt whether the person resigned or was fired,* and apparently that's very sensitive, and I can understand why. But I understood that someone else would be offered as an opinion to that effect. [Emphasis added.]

Q. Okay. And ... you never discussed—other than raising that with [counsel for Mr. Crawford], you had no further discussions about who that expert is, correct?

A. That's correct.

■ It is true that Professor Hazard agreed with counsel for Ms. Katz, Mr. Marshall and B & K that he was "not holding [himself] out as an expert in employment litigation." However, Professor Hazard described himself as "an expert in how to conduct litigation generally." Earlier in the deposition, Professor Hazard informed counsel for Mr. Balaran that his expertise is "[p]rofessional ethics in civil litigation" and that he had previously testified about ethical issues in a class action employment lawsuit.[11] In that regard,

---

10. Professor Hazard inadvertently referred to Mr. Crawford's complaint as a "discrimination claim" instead of a wrongful termination claim.

11. At the time he prepared his opinion letter and gave deposition testimony in this case, Professor Hazard was the Miller Distinguished Professor of Law at the University of California Hastings College of the Law, and previously had served as Trustee Professor of

there are professional norms—statutes, regulations, and ethics—that apply to all civil litigation and, presumably, additional norms applicable to employment law cases of various sorts. Hence, we believe that Professor Hazard's testimony is properly evaluated in the context of professional norms applicable to civil litigation alleging a wrongful termination of employment.

Our case law provides guidance as to how to evaluate Professor Hazard's testimony. In *Battle, supra,* we said that "an attorney will be qualified to testify as an expert in a legal malpractice action if the witness is a general legal practitioner who by training and experience is familiar with the degree of care and skill reasonably to be expected of lawyers acting under the circumstances of the case in which the expert is testifying." 646 A.2d at 323. We clarified in *Battle,* a Medicaid fraud case, that the expert need not be a Medicaid fraud specialist or have handled a Medicaid fraud case, so long as the proposed expert "by training and experience is familiar with the degree of care and skill reasonably to be expected of lawyers acting under the circumstances of the case in which the expert is testifying." *Id.*

Significantly, the trial court's evaluation of the type of expert Mr. Crawford had to

present may have been influenced by Professor Hazard's own statements regarding an employment law expert, but the court's evaluation exceeded the requirements of our case law. Under *Battle,* we conclude that Professor Hazard is not disqualified from providing expert testimony about the professional norms and ethics applicable to civil litigation, including negotiation, alleging a wrongful termination of employment. We agree with the trial court that the Phantom Stock Option Plan would be part of the severance negotiations.[12] However, we cannot agree with the court, in light of *Battle,* that the expertise required to establish the standard of care for the settlement negotiations and wrongful discharge litigation had to include particularized expertise about stock option plans. Mr. Crawford's complaint for malpractice did not depend solely on faulty advice during that part of the severance negotiations that concerned the stock options, but on advice during the entire course of severance and settlement negotiations. Consequently, it is irrelevant, in the trial court's words, that "Professor Hazard [did] not purport to be expressing an opinion regarding the standard of care for an attorney assisting a client in that type of negotiation" or an opinion as to "whether the

---

Law at the University of Pennsylvania, Professor of Law and Sterling Professor of Law Emeritus at Yale University, and Professor of Law at the University of Chicago. Through the years his professional appointments and board memberships included work with the American Bar Association on professional standards, ethics, professional responsibility, and lawyers' responsibility for client protection. He is the author of numerous scholarly and professional publications.

**12.** As the trial court stated in rejecting Professor Hazard as an expert on the standard of care:

[The December 20, 1999,] memorandum was prepared in the context of Mr. Crawford's attempt to negotiate a severance

package with BET. It is clear from the record that a major concern of Mr. Crawford related to the vesting and cashing out of certain stock options; the subject of the December 20 memorandum is "Phantom Stock Option Plan." The memorandum included a proposal under which Mr. Crawford would have remained at BET until June 2000, and BET would agree to accelerate and enhance his rights to stock options. Professor Hazard does not purport to be expressing an opinion regarding the standard of care for an attorney assisting a client in that type of negotiation, much less whether the terms used in the memorandum breached that standard, given the client's objectives at the time.

terms used in the memorandum breached that standard, given the client's objectives at the time."

As we have indicated, Professor Hazard's expert testimony is premised on a Statement of Facts that Legal Expert May Assume, prepared by B & K at his request; and the Statement was based on eventual proof that Mr. Crawford had been "fired" or "involuntarily terminated" from BET. Given the premise of his testimony, Professor Hazard clearly establishes several grounds on which Mr. Crawford's lawyers failed to meet the expected standard of care for the conduct of civil negotiation and litigation—grounds that are not dependent on any finding that some element of substantive employment law has been neglected beyond the stipulated involuntary termination. It is true that Professor Hazard stated in his opinion letter that he understood "there will be testimony by an expert in employment litigation that such a characterization by the complainant [i.e., a voluntary departure] is very seriously compromising" of the claim, and "[o]n that basis, the mischaracterization was a substantial departure from recognized standards of professional conduct." But, he prefaced that statement by opining: "*Under any circumstances,* such an inaccuracy would be embarrassing in the ensuing negotiations predicated on Mr. Crawford's expectations." (Emphasis added.) Professor Hazard outlined several other areas where Mr. Crawford's lawyers fell short in representing him as negotiators and litigators generally, without regard to the specifics of substantive employment law.

When Professor Hazard's letter and deposition are read together, it becomes clear that he is opining as an expert on the professional norms and ethics *always* to be followed by negotiators and litigators in this or any other kind of civil case—assum-

ing that the client (here Mr. Crawford) was fired. The professor is revealing his understanding that there will be an employment law expert who will explain the signs indicating "whether the person resigned or was fired," as well as the "very serious" legal consequences of involuntary discharge when an employee confronts an employer with alleged financial irregularities. He is saying, an employment law expert may help establish the premise Mr. Crawford's attorneys have given for my testimony, and perhaps may enlighten the jury as to the measure of damages in this kind of case. But, based on that premise, my expert opinion is that Mr. Crawford's lawyers failed him in the specified ways I have mentioned, in violation of the applicable national standards of care for negotiating a settlement and conducting civil litigation.

Under this interpretation of Professor Hazard's opinion letter and deposition testimony, we cannot agree that his testimony was conditioned on the appearance of an employment law expert. His testimony unquestionably concluded that there was legal malpractice, regardless of particular laws applicable to employment (other than the stipulated premise of involuntary termination). Under this standard, Professor Hazard is not disqualified from providing expert testimony about the professional norms and ethics applicable to civil negotiation and litigation. In short, in light of the nature of the malpractice claimed in this case, he need not be an expert both in the professional norms and ethics applicable to civil litigation in a wrongful discharge case *and* an expert on the intricacies of various types of employment law.

### The Conflict of Interest Issue

We next move to Mr. Crawford's assignments of error with respect to the trial court's rulings on his specific claims against Ms. Katz, B & K, and Mr. Mar-

shall. In granting Mr. Balaran's second summary judgment motion, the trial court stated: "To the extent that [Mr. Crawford's] claims against other defendants also are premised on the alleged negligence of Mr. Balaran, the other defendants also are entitled to summary judgment as to those claims." Mr. Crawford alleges that the trial court misinterpreted his conflict of interest claim against Ms. Katz, B & K and Mr. Marshall, and hence, the court "incorrectly believed this conflict of interest could not be proven unless [he] first established that Mr. Balaran committed negligence." As discussed in the previous section of this opinion, we conclude that Professor Hazard proffered evidence to support such professional negligence.

Our review of the record reveals that the trial court's analysis of the conflict of interest claim also was impacted and shortened by its conviction that Mr. Crawford provided information to his attorneys (regarding BET's financial misconduct and other matters) that formed the basis of the allegations in his complaint for wrongful discharge, and thus, he "can hardly claim that there was a conflict between him and his former counsel because they relied on his factual representations in pursuing litigation on his behalf, particularly when [Mr. Crawford] has reaffirmed and continues to insist that what he told them was true." Having reached this conclusion, the trial court did not address major points made by Professor Hazard in his opinion letter and deposition regarding the claimed conflict of interest issue.

There are two prongs to Mr. Crawford's conflict of interest claim: 1) the failure of the lawyers to inform or disclose and discuss or explain certain key matters with Mr. Crawford in light of BET's Rule 11 sanctions motion; and 2) the blame-shift-ing tone of B & K's January 28, 2003, settlement letter to Mr. Crawford, authored by Ms. Katz. After Mr. Crawford filed his complaint against BET, BET's lawyers filed the Rule 11 sanctions motion against Mr. Crawford and his lawyers, undoubtedly because of the allegations of financial misconduct on the part of BET and its officers. Rule 11(b) requires that an attorney make a reasonable inquiry to determine, in part, whether "the claims, defenses and other legal contentions [in the complaint] are warranted by existing law ..."; and that "the allegations and other factual contentions have evidentiary support or ... are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery...." Super. Ct. Civ. R. 11(b)(2) and (3); *see also Goldschmidt v. Paley, Rothman, Goldstein, Rosenberg & Cooper, Chtd.,* 935 A.2d 362, 377 (D.C.2007).

Professor Hazard identifies two separate instances of the lawyers' failure to disclose or discuss with their client: (1) the potential conflict of interest; and (2) the consequences to Mr. Crawford resulting from making unsubstantiated claims of financial misconduct under Rule 11 and to his future employment prospects. Professor Hazard declared that the lawyers should have told Mr. Crawford about the requirements of Rule 11, the possibility of a motion for Rule 11 sanctions if there was no "reasonable investigation" of his allegations of financial misconduct, and the potential of a conflict of interest. In his deposition, Professor Hazard explained that Mr. Crawford would need support for his allegations and the lawyers should have asked, "who else have you got to support the contentions?"[13] Professor Hazard opined that Mr. Crawford's lawyers' failure to explain the conflict of interest creat-

---

13. Professor Hazard acknowledged that if Mr. Marshall had interviewed Ms. Jacobs and Ms. Gantt, other employees at BET, that fact could change his opinion.

ed by BET's Rule 11 motion constituted a "substantial departure from recognized standards of professional conduct." As he stated in his opinion letter: "It was in the interest of the lawyers to assert that they were justified in relying on information provided by Mr. Crawford, whereas it was in [Mr. Crawford's] interest to assert that he was uninformed about the standard of investigation required under Rule 11."

As for the failure to advise Mr. Crawford about the potential impact of his financial misconduct allegations against BET, Professor Hazard asserted that the lawyers' failure to discuss with Mr. Crawford "the issue of making [financial misconduct] allegations" against BET and the possibility of "the negative effects on Mr. Crawford's ability to obtain new employment ... was a substantial departure from recognized standards of professional conduct." Professor Hazard explained in his deposition that Mr. Crawford's complaint "had pretty elaborate detail, and it was denunciatory, a denunciation of BET." That kind of denunciation "would ordinarily make the party asserting these contentions a less attractive employee, because it looks like it's going to be a very controversial matter." Therefore, the lawyers should have sat and thought through the allegations "with the client" and they should have broached "the pluses and minuses" of making such detailed allegations.

For the second prong of Mr. Crawford's conflict of interest claim, Professor Hazard opined, in part, that B & K's January 28, 2003, letter was "designed to shift to [Mr. Crawford] the responsibility for the weakened position ... against BET"; that the letter "discourag[ed] Mr. Crawford in asserting his claim against BET, and induc[ed] him to settle the claim at a radical discount"; and "[a]s such, [the letter] is an abandonment of the client and a substantial departure from recognized standards

of professional conduct." In response to questions about the letter raised by defendants/appellees' counsel during his deposition, Professor Hazard emphasized the tone and approach of the letter and pointed to the lack of "appropriate[ ] balance[ ]." He characterized it as "a strong statement that ... you are disbelievable and you ought to settle ...," and maintained that the language "suggests that 'we're no longer committed to your cause.' " Professor Hazard continued: "It's one of our jobs in dealing with a client whose testimony, in our opinion ... is relatively weak or subject to challenge, you still have your responsibility of loyalty to the client, but within—and in furtherance of that, trying to get the client to be realistic as you see it."

In light of this evidence, Mr. Crawford argues on appeal that: "the attorneys' conflict in advising Mr. Crawford was between the client's best interests, and the lawyers' own interest in avoiding possible consequences of their former colleague's bad advice," and that Comment 11 to Rule 1.7 of the District's Rules of Professional Conduct makes clear that "[i]f the probity of a lawyer's own conduct in a transaction is in serious question, it may be difficult or impossible for the lawyer to give a client detailed advice." Ms. Katz, B & K and Mr. Marshall contend that Mr. Crawford's bad legal advice argument was not preserved in the trial court, and hence, it may not be considered on appeal.

■ Contrary to appellees' assertion, we conclude that Mr. Crawford preserved the issue of whether B & K's settlement advice was tainted by a conflict of interest arising from Mr. Balaran's alleged negligence. As appellees point out, "[q]uestions not properly raised and preserved during the proceedings under examination, and points not asserted with sufficient precision to indicate distinctly the party's the-

sis, will normally be spurned on appeal." *Womack v. United States*, 673 A.2d 603, 612 (D.C.1996) (quoting *Miller v. Avirom*, 127 U.S.App.D.C. 367, 369–70, 384 F.2d 319, 321–22 (1967)). However, in this case "we are dealing with an argument rather than a claim," which "may properly be asserted for the first time on appeal." *Randolph v. United States*, 882 A.2d 210, 217 (D.C.2005) (citation omitted). Mr. Crawford stated in his first amended complaint that Ms. Katz's failure to disclose what she perceived to be her former partner's negligence colored her settlement advice and "undercut" Mr. Crawford's claims against BET. Furthermore, the trial court noted that, in his opposition to defendants' motion for summary judgment, Mr. Crawford asserted that there was an issue as to whether defendants "could advise[ ] him at all" given the alleged conflicts and personal motivations in which their settlement advice was couched. Given the claims Mr. Crawford raised in his first amended complaint and the assertions in his opposition to defendants' motion for summary judgment, the argument regarding "bad legal advice" was adequately preserved for appellate review.[14] *See Technical Land, Inc. v. Firemen's Ins. Co.*, 756 A.2d 439, 448 (D.C.2000).

 Because Mr. Crawford preserved his conflicted legal advice claim in the trial court, and his bad legal advice argument is part of that claim, that argument may be made on appeal. Moreover, neither the assumed fact that Mr. Crawford gave information to his lawyers on which they relied in drafting the complaint for wrongful termination, nor the possibility that the lawyers and Mr. Crawford agreed that his action against BET was warranted, would necessarily defeat Mr. Crawford's conflict of interest claim.[15] As the Second Circuit has stated: "A potential for conflict is inherent in a sanctions motion that is directed against both a client and a lawyer, even when . . . the two agree that an action was fully warranted in fact and law." *Healey v. Chelsea Res. Ltd.*, 947 F.2d 611, 623 (2d Cir.1991). And, "[a] sanctions motion attacking the factual basis for the suit will almost inevitably put the two in conflict, placing in question the attorney's right to rely on his client's representations and the client's right to rely on his lawyer's advice."[16] *Id.*

The problem in this case is that the trial court did not address the substance of Mr. Crawford's conflict of interest claim, and recognized that other aspects of his lawsuit also might still be viable. Specifically, the court used as an example of other grounds of professional negligence addressed by Professor Hazard, "the issue of making such allegations [of financial misconduct by BET], . . . the practical consequences of doing so," and the failure to discuss the issue with Mr. Crawford. In that regard, the trial court correctly stated that "[i]n most instances, issues of negligence are

---

14. Mr. Crawford does not challenge on appeal, and therefore we need not address, the attorney judgment doctrine discussed by the trial court.

15. Although Mr. Crawford provided an affidavit in opposition to the Rule 11 motion for sanctions, that did not necessarily eliminate the ethical obligation of his lawyers to disclose, discuss, and explain the potential conflict to him, and to remain loyal to him.

16. We agree with the Second Circuit that separation of the Rule 11 sanctions motion from the prosecution of the underlying lawsuit is required, as Judge Boasberg did in this case. But, deferring consideration of the sanctions motion to avoid an immediate conflict of interest during the trial of the wrongful termination case does not mean that for purposes of the malpractice action no conflict of interest existed, and no conflicted legal advice was rendered, at the time B & K sent its letter urging settlement to Mr. Crawford.

inappropriate for adjudication on summary judgment," citing *Croce, supra,* 657 A.2d at 310. This is particularly true where, as here, the court acknowledged that "questions of fact remain regarding whether Mr. Crawford misrepresented or withheld material information from counsel, can prove causation, and can prove more than speculative damages." While appellees urge us to decide these issues, especially causation, on appeal, we think the better course is to remand for the trial court to address such issues in the first instance. In short, we are constrained to conclude that the trial court should not have granted summary judgment to Ms. Katz, B & K, and Mr. Marshall on Mr. Crawford's professional negligence and conflict of interest claims.

### The Motion for Reconsideration

We next consider whether the trial court abused its discretion in treating Mr. Crawford's remaining claims as conceded because he failed to file an opposition to appellees' motion for reconsideration, filed under Super. Ct. Civ. R. 12–I. Mr. Crawford does not dispute that he failed to file an opposition to appellees' motion for reconsideration, but he argues that the trial court abused its discretion when it deemed the motion as "conceded" under Rule 12–I(e) without conducting an independent review of the pleadings and other papers to determine whether appellees were entitled to summary judgment on various outstanding issues. Specifically, Mr. Crawford asserts that certain issues in his amended complaint were never addressed or resolved on summary judgment. For instance, the trial court did not address Mr. Crawford's claims that appellees were negligent (1) in failing to depose or take sworn statements from two potential witnesses—Ms. Jacobs and Ms. Gantt, and (2) in drafting the wrongful termination complaint against BET.

Super. Ct. Civ. R. 12–I(e), relating partly to opposition to motions, states in pertinent part:

> A statement of opposing points and authorities shall be filed and served within 10 days or such further time as the Court may grant. If a statement of opposing points and authorities is not filed within the prescribed time, the Court may treat the motion as conceded.

Super. Ct. Civ. R. 12–I(e). We have said that in the case of motions for summary judgment, the trial court may not "treat the motion as automatically conceded, given the requirement of Rule 56(c) that the court itself must examine the record to confirm that there is no genuine issue of material fact and that the movant, on the basis of the undisputed material facts, is entitled to judgment as a matter of law." *Kurth v. Dobricky,* 487 A.2d 220, 224 (D.C. 1985) (citing *Milton Props., Inc. v. Newby,* 456 A.2d 349, 354 (D.C.1983)). We believe that this reasoning applies equally to motions for reconsideration of the denial of summary judgment. Thus, although Rule 12–I(e) "is precatory, not mandatory," it "must be given careful scrutiny" especially here, where failure to file an opposition could result in dismissal of a claim and where "our well-established preference for deciding cases on their merits," would be defeated. *National Voter Contact, Inc. v. Versace,* 511 A.2d 393, 397 (D.C.1986). We see no clear indication in the trial court's summary judgment orders or its reconsideration order that Mr. Crawford's remaining claims were examined by the trial court.[17] We therefore conclude that the

---

17. The trial court states that in their motion for reconsideration and "supporting memorandum and attachments, the defendants carefully review all the allegations in the plaintiff's First Amended Complaint and demonstrate that there are no issues remaining to be resolved by the [c]ourt, in light of the [c]ourt's prior rulings." Notably, the court

trial court should not have dismissed Mr. Crawford's remaining claims without first considering the merits.

Accordingly, for the foregoing reasons, we affirm the trial court's grant of summary judgment to Ms. Bernabei as to the period after November 3, 2000, but we reverse its order as to her for the period before November 3, 2000. In addition, we are constrained to reverse the judgment of the trial court as to Mr. Balaran, Ms. Katz, B & K and Mr. Marshall, and we remand this case for further proceedings.

*So ordered.*

does not indicate that it conducted an inde-

pendent examination of the record evidence.