THOMPSON, Associate Judge,
dissenting:
I see no reason why we should drag out this litigation through a remand when, on the summary judgment record that is.before . us, we are able to conclude as a matter of law that appellant Bartel is not entitled to recover under either of the statutory provisions on which he relies: D.C.Code §§ 28:3-312 and 28:3-309 (2012 Repl. & Supp.2014).[1] To explain why we are able to do so, I begin with a summary of the facts that adds some important details to the summary set out in the majority opinion.
On March 9,1994, Mr. Bartel purchased a cashier’s check in the amount, of $30,761.00 from NationsBank, the predecessor of Bank of America N.A. (the “Bank”)[2] The check was made payable to *1051 the order of “Dana McKinley or Edna McKinley or Richard Bartel.” In his summary judgment papers, Mr. Bartel explained that, from “shortly after its issuance,” the cheek was in the possession of Dana McKinley; it was “intended to be [Mr. Bartel’s] consideration for a contemplated later business transaction between the McKinleys and [Mr. Bartel].” Specifically, Mr. Bartel “sought for the McKin-leys to sell their shares of Eclipse Holdings, Inc. [a company of which Mr. Bartel was a majority shareholder] back to the company treasury.” Dana McKinley and Mr. Bartel “personally placed the check in [the McKinley’s fireproof] safe in 1994[.]” The McKinleys “refused to consummate the intended business transaction^]” but Mr. Bartel “nevertheless left the funds with Dana McKinley with hope that they would come to an agreement later.” The transaction that Mr. Bartel hoped for never occurred.
Mr. Bartel eventually made demands for return of the check in “numerous emails, telephone calls, and personal visits to Dana.” According to Mr. Bartel, Dana McKinley (“Dana”) told him that he “never touched or moved the check” and that “the check was never removed from his house,” but also stated at some point that the safe could not be opened because either he had fumbled a change in the combination or “his Guardian had changed the combination.” The guardian had been appointed in 2008 because Dana was suffering from “deteriorating mental illness.” At some point, the guardian had the safe drilled open, and the cashier’s check was not found.
Edna McKinley (“Edna”) died in April 2008, having at some point prior to that time become “blind and immobile.” The record does not disclose at what point Edna became blind and immobile, but, according to Mr. Bartel, he and the McKin-leys (i.e., both Edna and Dana) “continued to work together for several years” after the McKinleys declined' to sell their Eclipse Holdings stock. Further, although averring that Dana'stated that he “never touched or moved the check,” Mr. Bartel made no reference to any equivalent representation by Edna.
Mr. Bartel stated in a May 2008 email that Rene McKinley (Dana’s sister anc] Edna’s daughter) had access to the McKinley safe “years ago” through “a combination given to her by a>:ffjend of Edna’s, William Sharrar.”
Dana McKinley died in September 2011. The cashier’s check was not listed on either Dana’s or Edna’s estate inventory, and the representatives of the estates reported that, after diligent efforts, they could find no evidence that the check was deposited into an account belonging to either.[3]
Mr. Bartel asserts that he had “no information indicáting to [him] that the' cashier’s check was lost until the inventory of Dana McKinley’s estate in 2ÓÍ3.” On July 29, 2013, he wrote to the Bank, attaching a copy of the check, making what he labeled a “declaration of loss,” and demanding payment. The Bank declined to honor his demand'for payment. It explained that, in compliance with federal law, it keeps its records] including records of predecessor *1052 banks, for a period of seven years, which exceeds the record-retention period required under federal law.[4] The Bank asserts that it has no records of the check and has been unable to “locate any information related to the Check.”[5]
On August 23, 2013 — more than 19 years after the cashier’s check was issued by the Bank’s predecessor — Mr. Bartel brought suit against appellee for the check amount of $30,761.00, asserting claims under Article 3 of the UCC. He argued in his summary judgment papers that, on the undisputed facts, he satisfies the requirements of § 28:3-312 (“§ 3-312”) (entitled “Lost, destroyed, or stolen cashier’s check, teller’s check, or certified check”) or, “alternatively,” the requirements of § 28:3-309 (“§ 3-909”) (entitled “Enforcement of lost, destroyed, or stolen instrument”). The appeal presents issues of statutory construction, as to which our review is de novo.
The summary judgment record enables us to conclude that Mr. Bartel does not satisfy the requirements of § 28:3-312. Section 3-312 creates an obligation for a bank (the “obligated bank”) to pay the amount of a cashier’s cheek to a “claimant” who declares, in a declaration of loss that comports with the requirements set out in the statute, that the check was lost, destroyed, or stolen. § 3-312(b)(4). To comply with § 3-312 with respect to a cashier’s check, a declaration of loss must state under penalty of perjury “to the effect” that:
(i) the declarer lost possession of a check,
(ii) the declarer is the ... remitter [i.e., purchaser] or payee of the check ...
(iii) the loss of possession was not the result of a transfer by the declarer or a lawful seizure, and
(iv) the declarer cannot reasonably obtain possession of the check because the check was destroyed, its whereabouts cannot be determined, or it is in the wrongful possession of an unknown person or a person that cannot be found or is not amenable to service of process.
§ 3-312(a)(3).
Mr. Bartel states that his “demand of July 29, 2013 ... satisfie[d] the definition of a “declaration of loss[,]”[6] However, quite clearly, his purported declaration of loss was missing some of the statutorily required elements. It does not state, under penalty of perjury or otherwise, that “the declarer lost possession of a check.” Nor does it state that “the loss of possession was not the result of a transfer by the declarer or a lawful seizure” (and, as discussed below, Mr. Bartel stated to the contrary, in a sworn interrogatory response, that he gave the check to the McKinleys to pay them for the (anticipated) sale of certain stock to Mr. Bartel).[7] *1053 In short, the purported declaration of loss did not strictly comply with § 3 — 812(a)(3).[8]
Just as clearly, the summary judgment record shows that Mr. Bartel cannot satisfy the requirements of § 3-309. Section 3~309(a), entitled “Enforcement of lost, destroyed, or stolen instrument,” provides that:
(a) A person not in possession of an instrument is entitled to enforce the instrument if:
(1) the person seeking to enforce the instrument ... [w]as entitled to enforce the instrument when loss of possession occurred ...
(2) [t]he loss of possession was not the result of a transfer by the person or a lawful seizure; and
(3) [t]he person cannot reasonably obtain possession of the instrument because the instrument was destroyed, its whereabouts cannot be determined, or it is in the wrongful possession of an unknown person or a person that cannot be found or is not amenable to service of process.
(b) A person seeking enforcement of an instrument under subsection (a) of this section must prove the terms of the instrument and the person’s right to enforce the instrument....
Thus, to prevail under § 3-309, Mr. Bar-tel must prove that “[t]he loss of possession [of the cashier’s check] was not the result of a transfer by the person.” Per D.C.Code § 28:3-203(a), an instrument is “transferred” “when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument.” Mr. Bartel acknowledges that he handed over possession of the cashier’s check to the McKinleys, named payees, in anticipation that, they would accept the check as consideration for the sale of their shares of stock in Eclipse Holdings, Inc. In other words, he voluntarily and purposely delivered the cheek to the McKinleys for the purpose of giving them the right to enforce it.[9] This undisputed fact alone is enough to defeat Mr. Bartel’s claim. The fact that his intent to enable the McKinleys to enforce the check was contingent upon their agreement to the stock sale, and the fact *1054 that Mr. Bartel had a right to, demand the return of the check or the purchase price if the sale did not occur, do not negate .the fact that he made a transfer that rendered him unable to satisfy § 3-309(a)(2).[10] See 6B Ronald A. Anderson, Anderson on the Uniform Commercial Code § 3-309:5, p. 261 (3d ed. 1998) (“The fact that the plaintiff would be able to ... set aside a transfer because of fraud or other reason does not remove the bar imposed by .,. § 3-309 of having made a voluntary transfer.”). Mr. Bartel’s transfer to the McKin-leys- “vest[ed] in the[m as] transferee[s] any right of [Mr. Bartel as] transferor to enforce the instrument.” D.C.Code § 28:3-203(b).
Mr. Bartel also cannot prove through competent evidence that he has thé right to enforce the instrument, § 3 — 309(b); or that he had that right “when loss of possession occurred[.]” § 3-309(a)(l).[11] As Judge Kravitz recognized, Mr. Bartel was “handicapped in meeting [his] burden because [the McKinleys] died before the complaint was filed and [as far as the record shows, their] testimony was not preserved in a deposition[,]” Hamilton v. Howard Univ., 960 A,2d 308, 318 (D.C.2008), and because anything Dana told Mr. Bartel about the check would be inadinissi-ble hearsay. While Mr. Bartel might be able to call Dana’s guardian, or the McKin-leys’ estate representatives, or other witnesses to testify that the check was not found in the safe and that they found no evidence of a deposit of the cashier’s check amount into either of the McKinleys’ bank accounts, that evidence would have been relevant only to whether the McKinleys *1055 continued to possess the check at the time of their deaths, or whether they deposited the cashier’s check during a period for which their records or bank records are extant.[12] Moreover, such testimony would not have addressed, e.g., whether either of the McKinleys negotiated the check in some other way,[13] such as (as appellee suggests) by endorsing it and “transfer[ring] it to a third party holder in due course.” If either of them did transfer the check, the transfer “vest[ed] in the transferee any right of the transferor to enforce the instrument^,]” D.C.Code § 28:3-203(b) (“§ 3-203(b)”), and thus divested the named payees — including Mr. Bartel — of any right to enforce the instrument.[14] Cf. Cadle Co. v. Proulx, 143 N.H. 413, 725 A.2d 670, 672 (1999) (citing New Hampshire’s version of § 3-203(b) and holding that plaintiffs transfer of a note “divested [plaintiff] of the right to enforce the note in a court proceeding”); United States Bank, N.A. v. Ugrin, 150 Conn.App. 393, 91 A.3d 924, 930 (2014) (“If an endorsement makes a note payable to an identifiable person, it is a ‘special endorsement,’ and only the identified person in possession of the instrument is entitled to enforce the instrument.”). The same result follows if either of the McKinleys endorsed the cashier’s check in blank and it thereafter fell into the hands of a third person,[15] becoming payable to that person and- extinguishing any right, Mr. Bartel had to enforce the instrument. See D.C.Code § 28:3 — 109(c) (2012 Repl.) (providing that “[a]n instrument payable to an identified person may become payable to bearer if it is indorsed in blank pursuant to section 28:3-205(b)”); D.C.Code 28:3-205(b) (2012 Repl.) (“When indorsed in blank [i.e. indorsed without identifying a person to whom it is made payable], an instrument becomes payable to bearer and may be negotiated by transfer of possession alone[.]”). , As to these possibilities, the record contains only hearsay evidence (e.g., Mr. Bartel’s statement that Dana told him that he “never touched or moved the check”). “Such hearsay evidence is insufficient to create a genuine issue of material fact” and thus to avoid summary judgment. (Carla) Brown v. Argenbright Sec., Inc., 782 A.2d 752, 760 (D.C.2001).[16]
Mr. Bartel argues that the Bank should bear the burden of proving (as an affirma *1056 tive defense) that the check was already paid. That may be so (and I do not disagree with my colleagues on this point), but the point I make is that the Bank’s burden is not triggered unless Mr. Bartel first shows that he was entitled to enforce the instrument when loss of possession occurred (and, as already discussed, that he did not lose possession of the check as a result of a transfer). At the summary judgment stage, having told the court repeatedly (in successive motions for summary judgment) that the matter was ripe for decision on the summary judgment record, Mr. Bartel failed to come forward with sufficient competent evidence to meet his burden of proof.
There is a dearth of evidence about what the McKinleys might have done with the check in the years between 1994 and the years of their declining health and deaths (in 2008 and 2011). Mr. Bartel does not aver that Edna never touched or moved the check (although he made such an averment as to Dana). In addition, as Mr. Bartel himself explained, at some point during those many years, others (relative Renee McKinley and friend William Shar-rar) had the combination (and, it can reasonably be assumed, access) to the McKin-leys’ safe. Because items do not disappear out of safes into thin air, it is more likely than not (if not certain) that someone removed the check from the safe. To conclude that it is more likely than not (or as likely as not) that the check was removed from the safe and negotiated, it is not necessary, as the majority opinion appears to suggest, to assume that the check was wrongfully negotiated by one of the McKinleys, or that they or anyone else acted or intended to act unlawfully. As Mr. Bartel acknowledges in his Reply Brief, the McKinleys, as named payees, had an “indisputable right to alienate the check” (emphasis added). One of the McKinleys might lawfully have endorsed and negotiated or cashed the check,[17] fully *1057 intending to return the amount of the check to Mr. Bartel upon demand. Or, to give another example, one of the McKin-leys might have (lawfully) endorsed the check in blank, making it a bearer instrument and giving a third party who came into possession of the check a right under the law to enforce it. See D.C.Code § 28:3-301 (“A person may be a person entitled to enforce the instrument even though the person is not the owner of the instrument or is in wrongful possession of the instrument.”); Collins v. Gilbert, 94 U.S. 753, 754, 24 L.Ed. 170 (1877) (describing the presumption that “[possession of ... an instrument ... indorsed in blank, is prima facie evidence that the holder is the proper owner and lawful possessor of the same”); One West Bank, F.S.B. v. Bauer, 159 So.3d 843, 844 (Fla.Dist.Ct.App.2d Dist.2014) (“Because [the bank] possessed the original [negotiable instrument], endorsed in blank, it was the lawful holder of the note entitled to enforce its terms.”).
It is far from clear that the presumption on which the majority opinion relies — a presumption that people act lawfully, ante at 1049-50 — would apply in the UCC Article III context, given the many references in the official comments to theft, forgery, and fraudulent allegations of loss. See, e.g., comments 2 and 3 to § 3-312; see also (Darlene) Brown, note 10 supra, 359 P.3d at 779 (noting that the UCC Article III rule about who is entitled to enforce an instrument, such as a mortgage note, “focuses on the party who possesses the note in order to protect the borrower from being sued fraudulently or by multiple parties on the same note”). But even if it is assumed that our jurisdiction would apply a general presumption that people act lawfully and would also do so in the UCC Article III context, that presumption would not negate or overcome the presumption under the law pertaining to negotiable instruments, applied in the cases cited at the end of the preceding paragraph, that a person in possession of an instrument made payable to that person or to the bearer may lawfully enforce that instrument.[18] Thus, the presumption the majority opinion invokes does not assist Mr. Bartel in meeting his burden of proof as to his entitlement to enforce the check.
The record does not enable us to say what happened to the check, but what is clear on the record before us is that Mr. Bartel cannot prove by a preponderance of competent evidence a critical element of his § 3-309 claim: that fee retained entitlement to enforce the check at the time it allegedly was lost.[19] A jury would have to speculate in order to return a verdict for *1058 Mr. Bartel. For that reason, Judge Krav-itz did not err in granting summary judgment with respect to Mr.. Bartel’s § 3-309 claim. See McFarland v. George Washington Univ., 935 A.2d 337, 361 (D.C.2007) (Because “a jury would have to speculate in order to find [the requisite] causal link[, .. . the court] properly granted ... judgment as a matter of law.”).
My colleagues in the majority have elected to “exercise our discretion to leave [those] issue[s] for resolution by the trial court in the first instance” (quoting Folks v. District of Columbia, 93 A.3d 681, 686 (D.C.2014)), and they rely on case law “cautioning] that it usually will be neither prudent nor appropriate for this court” to affirm a grant of summary judgment on alternative grounds not decided by the trial court. Ante at 1047-48 (citing Jaiyeola v. District of Columbia, 40 A.3d 356, 372 (D.C.2012)). However, in Folks, the proposed alternative basis for summary judgment turned on whether the plaintiff had provided sufficient evidence that; the defendants had acted negligently, and we relied on authority holding that issues of -negligence are inappropriate for resolution on summary judgment. 93 A.3d at 686 (citing Crawford v. Katz, 32 A.3d 418, 435-436 (D.C.2011) (brackets omitted)). In Jaiyeo-la, the posture was that trial court had not considered “whether appellant genuinely needed to depose his former supervisor and obtain other discovery” in order to try to establish a prima facie case of discrimination, 40 A.3d at 372, and we treated the case as'one where “the issues are not ripe for consideration, not clearly presented by the record or ... it would be better to leave to the trial court the task of sifting through the summary judgment -record.” Id. at 373 (quoting Franco v. District of Columbia, 3 A.3d 300, 307 (D.C.2010)).
Given thé' record in this case — no one contends that additional discovery is needed, the issues were clearly presented below, the record is not voluminous, the issue is not negligence or any other basis on which summary judgment “should be granted sparingly,”[20] and the issues are ones of statutory construction — I think the more pertinent case authority can be found in this court’s recent decision in Stone v. Landis Constr. Co., 120 A.3d 1287 (D.C.2015):
In the absence of procedural unfairness, we may affirm a judgment on any valid ground, even if that ground was not relied upon by the trial judge. The requirement of procedural fairness is satisfied here, since the parties have fully briefed and argued th[e] substantive question[s].
Id. at 1289 n. 6 (internal quotation marks and citations, omitted); see also Grimes v. District of Columbia, 89 A.3d 107, 112 n. 3 (D.C.2014) (rejecting the trial court’s rationale for dismissal of a retaliation claim, but affirming the dismissal on the alternative ground, reasoning that there was “no unfairness in affirming on the {alternative] ground [that the complaint failed to state a DCHRA retaliation claim] ..., because [appellant] briefed that issue in this court and in-the trial court”).
For the foregoing reasons, I would affirm the judgment of the Superior Court in favor of appellee, on the ground that, on the undisputed factual record, appellant failed to satisfy the requirements of § 3-312 or § 3-309.[21] I respectfully dissent *1059 from the judgment remanding the case for further proceedings.

. The provisions of D.C.Code Title 28, Subtitle I contain the Uniform Commercial Code ("UCC”) as adopted in the District of Columbia. See D.C.Code § 28:1-101 (2012 Repl.).

. Mr, Bartel brought the instant action against appellee Bank of America Corporation, which asserted in its answer that the Bank is. "the sole proper party defendant.” *1051 However, appellee did not raise this as an issue in its brief in this appeal.

. Mr. Bartel requested that the Bank research the check. The Bank responded that it had no record of escheatment of the‘funds corresponding to the check amount. In addition, Mr. Bartel sent an inquiry to the office of the Comptroller of Maryland, the State in which the check was issued, which office reported that it had no record of unclaimed funds relating to the check.

. See 12 U.S.C. § 1829b (g) (2012) (providing that "[a]ny type of record or evidence required under this section [entitled "Retention of records by insured depository institutions”] shall be retained for such period as the Secretary may prescribe for the type in question” but that "[a] period so prescribed shall not exceed six years unless the Secretary determines ... that a longer period is necessary in the case of a particular type of record or evidence”).

. The Bank asserted in an opposition to Mr. Bartel’s motion for summary judgment that it "is extremely likely that one of the other payees negotiated the instrument years ago and that record of the transaction has since been destroyed as per BofA’s policies and procedures.”

. He has never argued that his demand letter plus his interrogatories or something else together constitute his declaration of loss.

. Further, Mr, Bartel did not assert in his Complaint that the loss of possession was not the result of a transfer. Cf. Hirsch v. Wells Fargo Bank, No. 1:13-cv-01489, 2014 WL 903119, *2-3, 2014 U.S. Dist. LEXIS 29587, *6 (N.D.Ohio Mar. 7, 2014) ("[W]hen a complaint omits facts that, if they existed, would clearly dominate the case, it seems fair to *1053 assume that those facts do not exist.” (quoting McGregor v. Industrial Excess Landfill, Inc., 856 F.2d 39, 42 (6th Cir.1988) (further citation omitted))).

. Because a declaration of loss that complies with § 3-312(a)(3) creates an obligation for the bank that issued the cashier’s check to pay the check, see § 3-312(b)(4), and because the obligated bank “may not impose additional requirements on the claimant,” U.C.C. § 3-312 cmt. 2, strict compliance with the elements of § 3-312(a)(3) is required.

. The McKinleys did not already have the right to enforce the instrument simply by virtue of the fact that they were named payees. To have a right to enforce the check, they needed to be (or to have been) in possession of the instrument. See D.C.Code § 28:3-301 (2012 Repl.) (providing that "person entitled to enforce” means "the holder of the instrument”); D.C.Code § 28:1-201(21) (2012 Repl. & Supp.2014) (providing that in the case of an instrument made payable to an identified person, the “holder” is that "identified person” if (s)he "is the person in possession”); Gregory E. Maggs, Determining the Rights and Liabilities of the Remitter of a Negotiable Instrument: A Theory Applied to Some Unsettled Questions, 36 B.C. L.Rev. 619, 649 (July 1995) ("[A] person who does not have possession of an instrument generally cannot enforce it.”).
I recognize that Mr. Bartel has asserted in his sworn interrogatory responses that he placed the check in the McKinleys’.safe "for safekeeping,” but, even if fully credited, that statement does not negate Mr. Bartel’s further sworn assertion that by delivering to the McKinleys the check payable to either of them, he gave them the authority to enforce the check, albeit in contemplation of their coming “to an accord regarding the[] sale” of their stock to Mr. Bartel.

. This is consistent with the guidance provided by the Permanent Editorial Board of the Uniform Commercial Code (the “UCC Board”). In a report that courts have cited numerous times as elucidating the application of Article 3 of the UCC, the UCC Board contemplates that if the Payee of a note borrows money from a. lender ("Funder”) and gives possession of the note (which, like a cashier’s check, is a negotiable instrument) to the Fun-der to secure the Payee's repayment obligation, the delivery of the note from Payee to Funder can constitute "a transfer of the note under UCC § 3-203” even though the Fun-der’s right to enforce its security interest in the note is contingent upon Payee’s default on its repayment obligation. Report of the Permanent Editorial Board for the Uniform Commercial Code, "Application of the Uniform Commercial Code to Selected Issues Relating to Mortgage Notes,” at 11 (November 14, 2011) (the "Report”); see also, e.g., (Darlene) Brown v. Dep't of Commerce, 359 P.3d 771, 778 (Wash.2015) (en banc) (citing the Report as “authoritative”); Skelton v. Urban Trust Bank, 516 B.R. 396„ 404 (N.D.Tex.2014) (applying the Report’s guidance on “transfers” under the UCC); Mandalay Resort Group v. Miller (In re Miller), 310 B.R. 185, 191 n. 11 (Bankr.C.D.Cal.2004) (explaining that- UCC Article III "negotiable instruments include [inter alia ] promissory notes, [and] cashier's checks”).
Moreover, to conclude that there was no transfer within the meaning of D.C.Code § 28:3-203(a) because of-circumstances related to the anticipated business deal would contravene the general scheme of Article 3 of the U.C.C., which is to make it unnecessary to "delve into the contractual relationships of named payees[.]” Cf. American Nat'l Ins. Co. v. Citibank, 543 F.3d 907, 910 (7th Cir.2008); see also id. at 909-10 ("Instead of being able to look at the payee line and to verify that the person presenting the check was indeed entitled to do so, banks in ANICO’s world would need to conduct a full-blown investigation every time to make sure that a party with an equitable interest in the check was not lurking in the background. Such a system would bring commercial transactions to a grinding halt.”).

. A person seeking to enforce an instrument under § 3-309 has the burden of proving "the terms of the instrument” and the person's "right to enforce the instrument.” § 3-309(b). Since one of the terms of the instrument is the payee, see, e.g., Yahn & McDonnell, Inc. v. Farthers Bank of Delaware, 708 F.2d 104, 109 (3d Cir.1983), "right to enforce the instrument” must mean something more than status as one of the alternative named payees.

. Mr. Bartel stated in a June 2009 email that the check had not been cashed "since 1999” — presumably the earliest date covered by the McKinleys’ existing bank records. That leaves five years prior to 1999 as to which Mr. Bartel has come forward with no competent evidence accounting for the status or disposition of the check. Yet, "[v]irtually all [cashier’s checks] are presented for payment within 90 days” after the date of issuance. U.C.C. § 3-312 cmt. 3.

. Per D.C.Code 28:3-201(a), " ‘[n]egotiation’ means a transfer of possession, whether voluntary or involuntary, of an instrument by a person other than the issuer to a person who thereby becomes its holder.” "Except for negotiation by a remitter, if an instrument is payable to an identified person, negotiation requires transfer of possession of the instrument and its indorsement by the holder. If an instrument is payable to bearer, it may be negotiated by transfer of possession alone.” Id., § 3 — 201(b).

. Under D.C.Code § 28:3-110(d) (2012 Repl.), ”[i]f an instrument [like the one at issue in this case] is payable to 2 or more persons alternatively, it is payable to any of them and may be negotiated, discharged, or enforced by any or all of them in possession of the instrument.”

. -As described above, the record suggests that at least two "third persons” — Rene McKinley and William Sharrar — had the combination to the safe,

. The foregoing issues — whether Mr. Bar-tel’s purported declaration of loss was legally sufficient and whether Mr. Bartel can prove that his loss of possession of the check, was not the result of a transfer and that he was entitled to enforce the check at the time it was lost — were raised by appellee in the trial court and' before us, and Mr. Bartel has had a full opportunity to brief the issues.' An additional issue — and, in my view, an additional reason *1056 why summary judgment in favor of appellee was warranted — relates to the requirement that a claimant seeking to enforce an instrument under § 3-312(a)(3)(i) must have been in possession of the instrument at the time it became "lost.’1 It appears that Mr. Bartel cannot satisfy this requirement either, because if the check was "lost,” it became lost not while it was in Mr. Bartel’s possession, but after it was delivered to Dana and placed in the McKinleys' safe. Cf. Seman v. First State Bank, 394 N.W.2d 557, 558-59, 560 (Minn.Ct.App.1986) (recounting that Seman purchased from the bank a cashier’s check that named as payee his former employee Evans, who was to use the money to buy Seman a car, and that after Seman gave Evans the check, he learned that Evans was a drug addict and was going to use the money to purchase drugs, and thereafter asked the bank to stop payment on the check; reasoning that the check was not "lost,” because “the purchaser himself had delivered the check to the named payee”). However, since the parties have not briefed or argued the issue as to when the check became "lost,” I do not rely on this additional basis.
I note that even if we assume that Mr. Bartel had (joint) constructive possession of the check in the safe, he still cannot prove that he lost it. If it was cashed or negotiated by one of the alternative payees, it was not lost. See Bank of Am. Nat’l Trust & Sav. Ass'n v. Allstate Ins. Co., 29 F.Supp.2d 1129, 1145 (C.D.Cal.1998) (“The instrument in question was not lost .,. — it was cashed.”).

. By leaving with the McKinleys a check payable to the order of either of them, Mr. Bartel made it possible and lawful for either of them to do so; Mr. Bartel’s action rendered the McKinleys, as payees, holders in possession "entitled to enforce [the] instrument.” D.C.Code § 28:3-301; see also D.C.Code § 28:1-201(21) (providing that a “holder” is "[t]he person in possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession”). I believe we can reasonably infer that what underlies the requirement in §§ 3-309 and 3-312 that a claimant seeking to recover on a "lost” negotiable instrument prove (in the case of § 3-309) or aver (in the case of § 3-312) that he did not transfer the instrument is a presumption that *1057 the transferee will cash or negotiate the instrument.

. And, unlike in Ruby v. Farmers Mut. Auto. Ins. Co., 274 Wis. 158, 79 N.W.2d 644 (1956), cited in the majority opinion, the facts alleged by Mr. Bartel do not weigh in favor of an inference of "loss.” In Ruby, involving the plaintiff’s claim against the insurer for the value of a large diamond that went missing from a gemstone ring, the court rejected the "presumption of theft” described in the insurance policy because the "preponderance of the credible evidence [including evidence that no one was known to have had access to the ring in the place where the plaintiff last saw it, and evidence that the ring contained two smaller diamonds that were not disturbed] ... indicate[d] to a reasonable certainty that a theft did not take place.” Id. at 648. There is no such preponderance of evidence here, as at least two people in addition to the McKin-leys had the combination to the safe where the cashier’s check was stored. As the rule against hearsay dictates, there also is no presumption that Dana McKinley spoke truthfully, accurately, and with a sound mind when, as Mr. Bartel claims, he told Bartel that he had not touched the check.

. Mr. Bartel was required to come forward with "competent evidence admissible at trial” to avoid summary judgment. Sanchez v. Magafan, 892 A.2d 1130, 1132 (D.C.2006); see also Nader v. de Toledano, 408 A.2d 31, 48 (D.C.1979) ("Summary judgment should be granted to the movant unless the opposing party offers competent evidence admissible at trial showing that there is a genuine issue as *1058 to a material fact.”). He was not entitled to wait until trial to develop or present the necessary evidence. See Aziken v. District of Columbia, 70 A.3d 213, 223 (D.C.2013).

. William J. Davis, Iric. v. Tuxedo LLC, 124 A.3d 612, 625 (D.C.2015) (internal quotation marks orhitted).

. I emphasize that- my dissent is based on Mr. Bartel’s inability to satisfy the statutory requirements of §§ 3-309 and 3-312, not on *1059 any lack of sympathy for his circumstance. I note that these UCC provisions “supplement” rather than displace other "principles of law and equity,” D.C.Code § 28:l-103(b) (2012 Repl.), meaning that they were no bar to Mr. Bartel’s pursuing other possible (litigation or non-litigation) remedies, including the claims for unjust enrichment and conversion that he also made in his Complaint. (On appeal, however, he has not challenged the trial court’s ruling that he failed to make out' a prima facie case on his unjust enrichment and conversion claims.) I also note that while at least one court has expressed an inclination to waive or bend the technical requirements of § 3-309 where there is little or <no "risk that [the defendant] will ultimately be prejudiced by plaintiff's lack of due diligence,” A.I. Credit Corp. v. Gohres, 299 F.Supp.2d 1156, 1160 (D.Nev.2004), that circumstance is not presented here. If the Bank or its predecessor did pay the cashier’s check (as many as 21 years ago), no bond or other security will keep the Bank from being "forced to pay ,.. twice” (the "primary concern with regard to enforcement of a missing [negotiable instrument”) if it is required to pay Mr. Bartel. Id.